GEORGE W. PEABODY v. CITIZENS STATE BANK OF ST. CHARLES.
and Another.[1]

June 15, 1906.

Nos. 14,730—(96).

**Bank Check—Wrongful Protest.**

In an action to recover damages for the wrongful and malicious protest of a bank check, it is *held* that the evidence sustains the findings of the trial court.

**Damages—Pleading.**

When such a check is wrongfully protested, the drawer may recover temperate compensatory damages, without alleging and proving special damages.

**Same—Right to Recovery.**

The right to recover such damages is not confined to a trader in the restricted sense in which the term is used in the bankruptcy laws, but extends to any person who is engaged in business and whose credit is thus necessarily injured.

Action in the district court for Winona county to recover $501.81 for the wrongful and malicious protest of a bank check drawn by plaintiff. The case was tried before Snow, J., who found in favor of plaintiff for $50. From a judgment entered pursuant to the findings, defendants appealed. Affirmed.

*Brown, Abbott & Somsen,* for appellants.
*Webber & Lees,* for respondent.

ELLIOTT, J.

Appeal from a judgment rendered against the defendant in an action for damages for the wrongful and malicious protest of a bank check. The case was tried by the court without a jury, and the most important questions for our determination arise upon the claim that the evidence does not sustain the court's findings that (a) due demand for payment of the check was not made; (b) payment was not refused; (c) that payment was tendered before protest was made; and (d) that the check was wantonly protested.

[1]Reported in 108 N. W. 272.

1. The trial court found that the Citizens State Bank of St. Charles, during the time of the transactions in question, was a corporation engaged in the banking business in the city of St. Charles, in Winona county, and that the defendant Knapp was its assistant cashier, and also a duly appointed and commissioned notary public. On November 22, 1904, and until November 30, 1904, Robert A. Johnson and S. J. Lombard were, and for some time prior thereto had been, carrying on a private bank at the village of Utica, in Winona county, under the firm name of the First Bank of Utica, where deposits were received, checks paid, and a general banking business done. For some time prior to this plaintiff owned a large farm in the county of Winona, and was engaged in farming, and in connection therewith raising, buying, and selling thoroughbred horses and cattle, and the conducting of such financial and other business affairs as were incidental to that occupation. On November 22 and November 29, 1904, the plaintiff had on deposit and to his credit at said First Bank of Utica, subject to his check, a sum of money exceeding $100. On November 22, 1904, the plaintiff drew and delivered to the Brown Mercantile Company a check upon the First Bank of Utica for the sum of $100. This check was in the ordinary form, and was on November 29 by the Brown Mercantile Company indorsed and delivered to the Citizens Bank of St. Charles, one of the defendants. On the same day, shortly before four o'clock in the afternoon, the defendant Knapp, acting as an officer and agent of the defendant Citizens State Bank, and with due authority and direction therefrom, appeared at the First Bank of Utica, having in his possession said check drawn by plaintiff and six or seven other checks upon said First Bank of Utica drawn by other persons, the aggregate amount of all the checks, including the plaintiff's said check, being nearly $1,800, and demanded from said First Bank of Utica cash payment of all said checks and the aggregate amount called for by the same.

There was no separate or distinct presentation or demand for payment of plaintiff's said check. One Louden was then in charge of said First Bank of Utica, acting as cashier thereof, under authority from said Johnson and Lombard. He had not sufficient cash then actually on hand in said bank to pay all of the checks, but had more than enough to pay plaintiff's check, if specific and independent demand

had been made for payment thereof. The First Bank of Utica had, however, in the First National Bank of St. Charles, Minnesota, a much larger sum of money than would have been necessary to pay all of the checks, and offered Knapp, for said Citizens State Bank, a check 'on said First National Bank for the full amount thereof, but the offer was refused. In the meantime the First National Bank, at the request of Lombard, sent a special messenger bearing $2,000 in currency to said First Bank of Utica—a distance of six miles—for the purpose of paying the checks, and of this fact Knapp was informed by Louden; but Knapp declined to wait for the currency and left the village of Utica before five o'clock p. m. to return to St. Charles. Before leaving he furnished Louden with a list of the checks, giving the amounts and other particulars thereof, but made no new demand for payment of them, or any one of them, after the list was made.

The evidence does not show that said Knapp at any time made demand for payment of plaintiff's check, either singly or as one of the bunch of checks, expressly in his capacity as a notary. There was no express refusal by Louden, acting for the First Bank of Utica, to pay plaintiff's check or any other of the checks above referred to. Within fifteen minutes after the departure of Knapp from Utica the messenger from the First National Bank arrived at the First Bank of Utica, bringing to and for the last-named bank $2,000 in currency. Thereupon Louden, from the sum received, counted out all the money necessary to take up all the checks and gave the same to one Hans, with instructions to overtake Knapp, who was then on his way on foot to St. Charles, and tender the same in payment of all the checks. Hans did overtake Knapp about midway between Utica and St. Charles and informed him of his authority to tender the money, and of his readiness to hand it over to Knapp forthwith; but Knapp declined to receive it on the plea that it was too dark to count it. Knapp then took a seat in the buggy with Hans and they proceeded together to St. Charles. On their arrival there Hans asked Knapp to step into the back room of the First National Bank, which was but a few feet away, for the purpose of receiving the money in payment of the checks. Hans still had in his keeping and in readiness to pay over to Knapp the full amount required for such payment, as Knapp then knew, or, at least, had been informed and led to believe. Knapp, however, declined to enter the room for this

purpose, nor did he mention or suggest any other place where he would receive the money, but passed on towards the Citizens State Bank. He had advanced not more than two hundred feet when he was met by one Spencer, who, acting under specific instruction from Lombard, one of the proprietors of the Utica Bank, also offered him the full amount required to pay all the checks, holding the money in his hand for that purpose. Knapp again refused to receive the money, alleging as a reason that "it was pretty cold there," but did not mention any place where he would receive it. When each and both of these offers of payment were made, Knapp still had the checks in his possession.

On the evening of the same day, November 29, 1904, George Pfeffercorn, who was then cashier of said Citizens State Bank and who had been informed of what had taken place including the offers to pay, caused Knapp to communicate with Lombard by telephone and request that he come to the Citizens State Bank and settle the matter of the checks, but coupling with the request the demand that he enter into an arrangement with the Citizens State Bank to "par checks" in the future; that is, make an arrangement for the payment by the Citizens and the First Bank of Utica of checks drawn upon the other without exacting exchange or charge for transmission or collection. Lombard, on the plea of being too busy, declined to go over to the Citizens State Bank that evening. If Lombard had gone there that evening, neither Pfeffercorn nor Knapp, acting for their said bank, would then have accepted payment of the checks, or any one of them, unless either the proposed arrangement to par checks had been entered into or protest fees paid on the particular checks in question.

On the evening of November 29, 1904, after the telephonic communication with Lombard, defendant Knapp, in his official capacity as notary public, made out, signed, and mailed, postage prepaid, to the plaintiff, to said Brown Mercantile Company, as indorser of plaintiff's said check, and to said First Bank of Utica, drawee therein named, at their respective post office addresses, a notice of protest in the usual form. These notices were addressed on their face to the drawer, indorser, and drawee of the check of plaintiff, respectively, and were received by them in due course of mail. In the evening of November 29, or in the morning of November 30, 1904, Knapp made

98 M.—20

and recorded in his official register a certificate of protest. The protest and the said certificate thereof were made, and the notices were drawn and sent, on the advice and sanction of said Pfeffercorn as cashier of the defendant bank, with the knowledge of the previous offers of payment and of the other precedent facts and circumstances hereinabove stated, with the exception, perhaps, of the manner in which presentation of plaintiff's said check at said First Bank of Utica had been attempted, and upon consultation between him and defendant Knapp, in which the protest and the procedure connected therewith were determined upon.

The court finds that

> There had been no proper and legal presentation of plaintiff's said check to said First Bank of Utica for payment, and no refusal to pay the same previous to the said protest and the said certifying thereto and the said sending of the notices of alleged presentation and demand of payment and refusal to pay, and that said protest and certificate and sending of notices were wrongful, unjustifiable, and in wanton disregard of the rights and interests of the plaintiff.

The news of the protest gained wide circulation in the vicinity where the plaintiff resided and among his acquaintances and persons with whom he dealt or might deal in the prosecution of his business, causing remarks as to his pecuniary standing, and to some extent, though not greatly, injuring his financial credit. The court estimates and assesses his damages in the premises at $50.

2. The defendants contend that the court erred in finding that due demand for payment of the check in question was not made. The legal relation between a bank and a depositor is in most respects that of debtor and creditor. The title to the specific money deposited passes to the bank, which becomes indebted to the depositor in the amount of the deposit. The bank is then obliged to pay, when a demand is properly made. The well-understood customs of the business enter into and become a part of the contract. The obligation of the bank is to a certain extent conditional. It is not, like other debtors, obliged to seek its creditors and pay him wherever found. There is an implied limitation as to time and place. It must

pay in money at its banking house upon demand during the customary hours of business. "This being the understanding upon which the deposit is made, it is parcel of the bank's contract to repay—that, as a condition precedent to its duty to repay, the depositor shall call upon it to do so at its banking house, and there is no default of the bank until such call is made." Branch v. Dawson, 33 Minn. 399, 23 N. W. 552; Harrison v. Nicollet Nat. Bank, 41 Minn. 488, 43 N. W. 336, 5 L. R. A. 746, 16 Am. St. 718. Presentment of a check for payment is made when the holder or his agent produces and exhibits it to the proper official or agent of the bank so that he may have an opportunity to see that it is signed by the depositor, that it is so dated as to be payable at the time when it is presented, that it is properly filled out, that the party presenting it has the legal title to it by indorsement or otherwise, and that the indorsement, if any, is genuine. Waring v. Betts, 90 Va. 46, 17 S. E. 739, 44 Am. St. 890; Crawford v. West Side Bank, 100 N. Y. 50, 2 N. E. 881, 53 Am. 152.

The evidence as to what occurred between Louden and Knapp at the bank was conflicting, and the court was entitled to accept Louden's testimony, if it believed that he was telling the truth. Louden testified that Knapp came in, shook hands with him, made some remark about his having a nice safe, and sat down. He said he had come down to make some arrangement to par checks, and

> I told him I would have to take that matter up with Mr. Johnson and Mr. Lombard, and I would advise him later, and he talked along about general business until 4:18. He spoke to me about "parring" checks, by which he meant that he wanted us to take the checks that he received of ours at par—checks drawn on our bank—and for us to take all checks drawn on his bank at par. In this way no exchange would be charged for checks drawn on either bank. At that time we were charging exchange on checks on all banks. He pulled out a bunch of checks, and was running them over back and forth in his hands, and he said: "I have a bunch of checks here. * * * Unless we can make definite arrangements to par checks with you, I will have to have my money on this bunch." And I said: "If

you want your money, I will give you a draft on the Bankers National Bank of Chicago." And he says: "No, that won't go. The point is: Will you or will you not par checks?" And I says: "What is the amount of those checks?" He says: "The amount is immaterial. That is not the point. The point is this: Will you or will you not par checks?" And I says: "I will call Mr. Lombard," etc.

The witness testified that he called Mr. Lombard by telephone and explained the situation to him, and he said:

"You tell Mr. Knapp we will par the checks he has." And I told Mr. Knapp, and Mr. Knapp says: "No, that won't do at all. You got to agree to par all checks, and you got to agree to it here and now, or I will protest every one of these."

Knapp further said, in reply to the request that he call at the First National Bank of St. Charles on his way home for the money, that it wasn't a question of money; it was a question of parring checks.

He was still running over the bunch of checks in his hands, but finally put them in his pocket. I was sitting in a chair just about the same as here, and he was sitting on the desk about like this and inside the railing of the bank office. I did not have these checks in my hands until I received them from the First National Bank of St. Charles, after they had paid them the next day. I did not see the checks or examine them. * * * I did not know the amount of any of these checks, or the names of any of the drawers, until after they had been paid the next day. * * * If he had told me that he had a check drawn on our bank by George W. Peabody under date of November 22, 1904, for the sum of $100, I had sufficient funds at that time to Mr. Peabody's credit with which to take up and pay that check. * * * I had at that time sufficient money to pay Mr. Peabody's check. I would have paid it, had I known that his check was among the number. * * * [There was] no separate presentation of the Peabody check? No, he just simply said that he had a bunch of checks, and I asked him if they were on my bank. That is the way I spoke. * * * He did not take

these checks and lay them out one by one on the table or desk in the room in my presence.

Louden further testified that after he got the list and knew what the names were no demand for payment was made. If the court believed this testimony, there is certainly ample evidence to support the finding.

There is also evidence to sustain the finding that there never was a refusal to pay the check. Whatever may have occurred prior to the time when Knapp left the bank and started to walk to St. Charles, it is evident that he deliberately refused to accept the money, when offered to him by both Hans and Spencer, before the checks were protested. This refusal was entirely indefensible, and lends color to the theory that it was a contest between two rival banking concerns, in which the rights of the depositor were ruthlessly disregarded. Peabody had nothing to do with any checks other than his own and he had sufficient funds on deposit to pay his check. He had the right to have his check presented for payment without it being tied up with other checks and connected with a demand for "parring" checks. Had Knapp really wished to collect the money for the checks, it is reasonable to suppose that he would have accepted the proffered check on the St. Charles National Bank, which he admits he knew was good, and thus avoided the risk and danger of a long walk at night with a large amount of money in his possession. Such insistence upon technical rights is hardly consistent with good faith and fair dealing, and tends to sustain the trial court's conclusion that the subsequent protest of the check was in wilful disregard of the rights of the plaintiff. Of course, Knapp was not obliged to present the checks at the bank more than once; but when the money was brought to him before protest by the obligor, who was anxious and able to pay, he should have accepted it. The defendants' theory that the check was protested by the notary before he left the bank at Utica is untenable. Knapp testified that it was not decided to protest the checks until the meeting in the Citizens State Bank in the evening after his return to St. Charles.

A protest is a formal statement in writing that the described instrument was, on a certain day, presented for payment or acceptance, and that such payment or acceptance was refused. It is a formal declaration, executed by a notary, which in its popular sense means all

the steps and acts accompanying the dishonor of a bill or note neces-
sary to charge an indorser. 7 Cyc. 1051; Swayze v. Britton, 17 Kan.
625, 629. The word signifies to "testify before." As said by Daniel,
the testimony before the notary that proper steps were taken to fix
the drawer's liability is the substance and the certificate of the notary,
the formal evidence, to which the term "protest" is legally applicable.
2 Daniel, Neg. Inst. (5th Ed.) § 929. The same idea is suggested by
the language of the statute which calls the writing made by the notary
the "instrument of protest." R. L. 1905, § 2663. The notary is entitled
to a fee, "for drawing and copying of protest." This fee had not been
earned when the money to pay the checks was offered to Knapp. The
object of protest is to fix the liability of indorsers, and, after the money
was offered to Knapp, it is difficult to conceive of any reason why the
checks should have been protested, unless for the purpose of injuring
the standing of the bank or the maker of the check. Certainly, if the
money had been accepted, all legitimate reasons for protesting the
check would have been removed. See Wood, Byles, B. & N. 226;
Hartley v. Case, 1 C. & P. 555. The act of the notary, acting under
the instructions of the cashier of the bank, was the act of the bank.
Harrison v. Nicollet Nat. Bank, 41 Minn. 488, 43 N. W. 336, 5 L.
R. A. 746, 16 Am. St. 718; May v. Jones, 88 Ga. 308, 14 S. E. 552,
15 L. R. A. 637, 30 Am. St. 154.

The defendants contend that Peabody is not a trader, and could
therefore recover only nominal damages; but the findings require
the conclusion that he was a trader, within the liberal meaning of
that word which is required by modern conditions. A trader originally
meant a shopkeeper—that is, a tradesman; but it now in this connection
means merely a business man. In the bankruptcy law it is given a
more restrictive meaning, for reasons which are apparent from the con-
nection in which it is there used. See In re Stickney, 23 Fed. Cas.
77; Groves v. Kilgore, 72 Me. 489; State v. Barnes, 126 N. C. 1063,
35 S. E. 605. The distinction between a trader and others is referred
to in Svendsen v. State Bank of Duluth, 64 Minn. 40, 65 N. W. 1086,
31 L. R. A. 552, 58 Am. St. 522, but it is not there held that one who
is not a trader must prove special damages in order to recover more
than nominal damages. The best authorities support the rule that the
jury may give such temperate damages as they believe to be reasonable

compensation for the injury which must necessarily result from the act of the defendant.

Mr. Morse, in his work on Banks and Banking, states the rule of damages without distinguishing between traders and others: "If the bank refuses, without sufficient justification, to pay the check of the customer, the customer has his action for damages against the bank. It has been said that if, in such action, the customer does not show that he has suffered a tangible or measurable loss or injury from the refusal, he shall recover only nominal damages. * * * But the better authority seems to be that even if such actual loss or injury is not shown, yet more than nominal damages shall be given. It can hardly be possible that a customer's check can be wrongfully refused payment without some impeachment of his credit which must, in fact, be an actual injury, though he cannot, from the nature of the case, furnish independent, distinct proof thereof. * * * Special damage may be shown if the plaintiff be able, but if he be not able the jury may, nevertheless, give such [temperate] damages as they conceive to be a reasonable compensation for that indefinite mischief which such an act must be assumed to have inflicted, according to the ordinary course of human events." 2 Morse, Banks & Banking, § 458. See also Bank v. Goos, 39 Neb. 437, 58 N. W. 84, 23 L. R. A. 190; Atlanta v. Davis, 96 Ga. 334, 336, 23 S. E. 190, 51 Am. St. 139.

In Patterson v. Marine, 130 Pa. St. 419, 18 Atl. 632, 17 Am. St. 778, the plaintiff was the trustee of several estates. Chief Justice Paxson said: "Individual and corporate business could hardly exist for a day without banking facilities. At the same time, the business of the community would be at the mercy of banks if they could, at their pleasure, refuse to honor their depositors' checks, and then claim that such action was the mere breach of an ordinary contract, for which only nominal damages could be recovered unless special damages were proved. There is something more than a breach of contract in such cases. There is a question of public policy involved, as was said in First Nat. Bank v. Mason, 95 Pa. St. 113, 40 Am. 632; and a breach of the implied contract between the bank and its depositor entitles the latter to recover substantial damages." See Birchall v. Third Nat. Bank (Pa. C. P.) 19 Cent. Law J. 390, and authorities collected in a note.

The damages awarded in this case were well within this rule. As the plaintiff was entitled to recover more than nominal damages without proving special injury, the rulings of the court upon the introduction of evidence to which the defendants except were not prejudicial, even if erroneous.

Judgment affirmed.