MINNIE MILLER v. BANK OF WASHINGTON.

(Filed 9 October, 1918.)

**Appeal and Error—Divided Court—Judgments—Bank and Banking—Deposits—Claimant—Notice—Issues—Answers—Opinions.**

The matters for decision on this appeal are whether the defendant bank is responsible to the true owner for paying the depositor, under the facts of this case, after notice given to it by owner that the money was her own, and not that of the depositor; and whether the findings to the issues submitted were irreconcilable and a new trial should be ordered. The Court being equally divided; BROWN, J., not sitting; CLARK, C. J., writing an opinion; HOKE, J., concurring; WALKER and ALLEN, JJ., each writing a dissenting opinion. The judgment of the lower court is affirmed without being a precedent.

APPEAL by defendant from *Bond, J.,* at February Term, 1918, of BEAUFORT.

This is an appeal by the defendant bank from a judgment requiring it to pay the plaintiff Minnie Miller $800 and interest. The complaint alleged that her husband, G. H. Miller, had fraudulently procured said $800 from her, and with the fraudulent purpose to convert it to his own

use and unknown to her, had deposited it in the defendant bank in Washington, N. C., in his own name, but notwithstanding the notice to the bank from her of such facts and of the attendant circumstances, and her notice not to pay out the same to him, and though knowing that she was getting out an attachment upon said sum, the bank paid out the said money to G. H. Miller, who immediately absconded and left the State. The plaintiff says she handed him the money to put in the bank at Belhaven, where she lived.

The jury found upon the issues submitted that when the bank paid said fund over to G. H. Miller, the plaintiff Minnie Miller was the equitable owner of said deposit; that the bank knew that she claimed to own said fund, and knew, or had reason to believe, that she was getting out proceedings to have the same attached.

There was evidence that the said G. H. Miller was the second husband of the plaintiff, who had four children by her first husband, and that she mortgaged her home to procure this $800 to go into business with Miller, and gave it to him to deposit in the bank at Belhaven, where they lived, but without her authority he put it in the bank at Washington in his own name, and threatened to leave the State; that suspecting his purpose, she consulted a lawyer in Belhaven, who put her in phone communication with his partner, Mr. McMullen, a prominent lawyer in Washington, whom she notified that she would arrive on the next train. He took her in his car to the bank and saw the cashier, whom, as she testified, she told "all about" the circumstances, and that her husband was drinking and intended to defraud her of said sum. The cashier, while declining to admit that the money had been deposited by the husband, intimated to the plaintiff's lawyer, Mr. McMullen, who was also a director in the bank, that he could take out legal proceedings to stop payment. Mr. McMullen, after advising the cashier not to pay the money to plaintiff's husband, returned to his office with the plaintiff to get out proceedings in attachment. The defendant's cashier, knowing of this purpose, in a very short time, called up Mr. McMullen and told him he need not proceed any further, that he had paid out the $800 to Mr. G. H. Miller. The latter, having discovered his wife's purpose, had come through the country in an automobile, and, presenting himself to the cashier, after the plaintiff's notice to him that it was her property deposited with her husband for a certain specified purpose, and that he was intending fraudulently to convert it to his own uses, the cashier paid out the full amount thereof to him while attachment proceedings were being prepared. Miller immediately left the State and his whereabouts are unknown.

*Ward & Grimes for plaintiff.*
*Small, MacLean, Bragraw & Rodman for defendant.*

MILLER *v.* BANK.

CLARK, C. J. When a bank has reasonable notice of a *bona fide* claim that money deposited with it is the property of another than the de-. positor, it should withhold payment until there is reasonable opportunity to institute legal proceedings to contest the ownership. For a much stronger reason, a bank should withhold payment when it has notice, as in this case, not merely that the title to the fund is in question, but that it has been deposited without the authority of the owner, with the fraudulent intent on the part of a trustee.or agent to convert to his own use funds placed with him in trust.

Suppose the bank was notified that funds placed on deposit had been stolen by the depositor? The bank surely under such circumstances could not be justified in paying over said fund to the depositor. This is so, also, as a matter of public policy in cases where an agent or official deposits with a bank funds which it has notice that he has embezzled. The bank could not in such cases pay over such sum to the depositor without being a "fence."

In this case if there was not embezzlement, the evidence is uncontradicted that the bank had notice that the plaintiff claimed that said G. H. Miller had by false .pretenses procured his wife to mortgage her home to procure said $800, and had induced her to place the same in his hands for a specified purpose with the intent in breach of his trust to convert same to his own use. The defendant, with notice of these allegations made to it by the plaintiff, and with knowledge that said lawyer was preparing attachment proceedings, in a few minutes thereafter nevertheless paid out said fund to the husband, who immediately absconded. In the verdict and judgment holding the defendant liable for such payment there was no error. *Stair v. Bank,* 53 Pa. St., 364; 93 Amer. Decis., 759; *Bank v. Mason,* 95 Penn. St., 117; *McDermott v. Bank,* 100 *ib.,* 287. *Bank v. Mason* holds that the deposit is but *prima facie* evidence of the ownership of the fund by the depositor. *McDermott v. Bank* holds that money deposited in a bank to the credit of one person can be shown to be the property of another. It is also held in *Bank v. King,* 57 Penn. St., 206, that the deposit of money belonging to a trust fund by a trustee in his own name does not change the title thereto.

In such cases, when notice is given to a bank, it will pay the depositor at its own risk. *Bank v. Bache,* 71 Penn. St. (21 P. F. Smith), 213, citing *Bank v. King,* 7 B. P. Smith, 202. To the same purport *Bank v. Gillespie,* 137 U. S., 411, and annotations thereto in Rose's Notes.

In Tiffany on Banks, p. 50, it is said, "After receiving notice of an adverse claim, the bank will pay its depositor at its peril. . . . Payment to the equitable owner will, of course, always be a defense," citing *Brown v. Bank,* 51 Kan., 359; *Commission Co. v. Gerlack,* 92 Mo. App., 326; *Adams v. Shoe and Leather Co.,* 9 N. Y. Supp., 75.

In Morse on Banks (3 ed.), sec. 342, it is said: "A bank is justified in paying to the depositor, or his order, until the fund is claimed by some other person. But if notified that the funds belong to another, it will pay the depositor at its peril. If it has notice that a third person claims under a superior title and intends to enforce a claim adverse to the depository, the bank should hold the funds until the title is settled, or take a bond of indemnity; otherwise it may be a loser," citing several cases.

In our own State, *Bank v. Clapp,* 76 N. C., 482, holds that where the bank participates with the trustee in the misapplication of a fund, it is liable to the *cestui que trust* for any loss sustained thereby. In this case, while the bank did not actively participate in the sense of receiving any benefit therefrom, it was liable for its negligence, to say the least, in not holding the fund under all the circumstances till the plaintiff could take out legal proceedings and prove her allegations of being the beneficial owner of the fund, as she has since done in this action. The whole evidence shows the evident good faith of the plaintiff. Besides, the jury find that she was the direct owner of the deposit.

There is no evidence impeaching her character. On the contrary, two witnesses testified to her good character, and none to the contrary.

There is no defect in that the absconding husband is not a party to this proceeding. He has no possible interest in this action, for he has received the fund, and the judgment herein cannot affect him in any way. It would have been otherwise if the fund had not been paid over, but was still in litigation, and in that event the bank might have made him a party by publication. As it is, "The subsequent proceedings interest him no more."

It is true that the jury also found that the plaintiff did not notify the bank "that the $800 was her money and *why* it was in the bank and request the bank to hold it until she could have it attached," but in view of the fact that the jury found that the plaintiff was the equitable owner of the $800 when it paid Miller the money, and that it knew at the time that it paid him that the plaintiff claimed to own the money, and that it knew, or had reason to believe, that the plaintiff was proceeding to have the same attached, judgment was properly entered for the plaintiff. It was not essential that she should have notified the bank that it was her money, and why, and request the bank to hold it until she could have it attached when it is found that she was the real owner; that the bank knew she claimed to own the fund and knew, or had reason to believe, that she was proceeding to have it attached.

The statement of ten of the jurors after they were discharged that they intended to find a verdict for the defendant bank was a legal inference and was disregarded by the court. It was a matter which rested

within its discretion. If verdicts must be set aside as a matter of law upon such representations of a jury after its discharge, it will encourage proceedings that will be altogether unseemly in the practice of the courts and in the due administration of justice. The action of the judge in such cases must necessarily be left to the discretion of the presiding judge, who has full knowledge of the attendant circumstances, and possibly of much which does not appear in the record.

Upon the findings of the jury the judge properly entered judgment for the plaintiff.

The geologist upon the examination of a lump of coal can discover the species of trees of which it was composed eons ago. The layer of sandstone or of marble will show the raindrops and the footprints of passing animals when these substances were yet plastic with heat. Amber and other substances retain the insects that lighted upon them. From these substances the scientists can rebuild the story of thousands of years ago when man or semi-man, or beast, was floundering in the bogs and swamps where now stand the solid hills or spread out are the smiling plains. So in the dry records of legal proceedings are embalmed many a tale of wrong and of woe which can be deciphered by some future historian, but in few of them can be found a more pathetic or moving kinema of life than is shown in this case.

In this instance four helpless little children were left to the care of their widowed mother, who seemed to them a deity on earth—and to them such she was, for she alone stood between them and the cold and want and hunger of a heartless world. Their father despairing in the struggle of life, or perhaps with a diseased brain, and despondent, unsummoned and uncalled, struck by a suicide's hand staggered out of life into the great silence. In some sane and unselfish moment he had insured his life. With this the mother of these children bought an humble home. Then came the prowling wolf in human shape.

.With the plea that by the union of his labor and her little capital conditions could be bettered, he proposed marriage and a union of his labor and of her money, the latter to be raised by an $800 mortgage on the little home. The appeal to mother love, the most divine spark that this world holds, was irresistible. The marriage made, the $800 raised on the mortgage was given to the deceiver by the mother, to be placed in the bank where they lived. The enterprise had not yet been begun. The money was still the mother's (as the jury found). The agent, false to his trust, and without the plaintiff's authority or knowledge, placed the fund in his own name in the defendant bank, in a town 30 miles away. Learning of this, and that the trustee intended to fly the State, the frightened mother, unknowing at first what to do, was at last advised by counsel, and, hastening to Washington, N. C., by rail, in company with

a director of the defendant bank, told the cashier (as the jury find) that she claimed the fund, and the jury find also that she owned it and that the bank knew she would at once take out legal proceedings to attach it. In the meantime the false depositor, having been informed by wire or otherwise by some one, rushing through the country by automobile and getting to the bank, the defendant promptly paid the plaintiff's $800 over to him, and he disappeared "over the rim of the world," and his whereabouts are unknown to this day, according to the evidence. The defendant knew that the plaintiff's counsel was preparing papers to protect her rights as owner of the fund (as the jury find she was), for he phoned her counsel that he need not proceed, for he had paid out the fund to the defaulting and fugitive depositor. "Then all the Greeks took Sosthenes, the chief ruler of the synagogue, and beat him before the judgment seat, and Gallio (the governor and judge) cared for none of these things." Acts xviii, 16. The defendant cared not that the true owner should lose the fund, and that the defaulter should make off with it before the plaintiff, by legal proceedings, could protect the rights of herself and of her helpless children in the protecting fund left by their father.

The swindling defaulter has disappeared, no man knows where, and the plaintiff's money, the hope of her four little children, disappeared with him. The mortgage, however, remains and sticks closer than a brother, and with it and the court costs will go the roof from over their heads, unless speedy justice is rendered. Inspiration tells us that above the roof of that humble home is God and His Heaven, and poetry tells us that the stars are always shining there, but remove that shelter, and the snows and sleets and the winds of winter will come till the deceived and despairing mother, like the widow of Blennerhassett, perchance, "may be found alone at midnight, mingling her tears with the torrents that freeze as they fall."

It was easy for the defendant to regard only its own interests, and, careless of the rights of the plaintiff turn over the fund to the deceiver and the defaulter, while the plaintiff, as it knew, was endeavoring to complete the legal proceedings to enable her to assert her rights. The Court might lightly order a new trial, but the mortgagee will need his principal and interest when they are not forthcoming. There must be money for the lawyer and the witnesses, and there shall be the delays of justice "which maketh the heart sick," while the little children may lack shelter and cry for bread.

The plaintiff's $800 (for the jury find it was hers) was wrongfully paid out by the defendant in July, 1915, three years and two months ago, and the plaintiff has already lost more than $150, interest on money which she has not, besides the lawyer's fees and the loss of time attending

court, and other expenses, to recover her own. Is not this enough? Justice is "lame in its feet," like Mephibosheth, the son of Jonathan (2 Sam. iv, 4), and moves slowly. The Scriptures are full of injunctions to give judgment in righteousness for the protection of the "widow and the fatherless."

Have those fatherless little children no rights, which the courts can consider, in the shelter provided by the foresight of their unfortunate father—children of whom God, when He walked the earth, said that of such in heart were His kingdom?

The court and jury have said that the frantic and deceived mother was the true owner of that home, which she devotes to her children. Why protract litigation till interest and costs of litigation shall take it from them? The story of the fair-haired wife of Sparta's king,

> "Whose face launched a thousand ships
> And sacked the topmost towers of Troy,"

as told by the blind old bard, still moves the hearts of men, after the lapse of thirty centuries, in proof of the might and majesty and power of the beauty that is woman; but there is greater power, because more universal and more pathetic, in that mother love which dares do, and does, all for her children—a love which knows neither time nor place nor limit.

The human heart is like an Eolian harp, tuned and trembling to the touch of every wind that whispers by, making music, sad or sweet, as the breeze shall blow.

Women and children are the great heart of the world. Without them, there can be no future. Helpless they may seem, but the very continuance and existence of all humanity hang upon them. Justice should have no sword sharper, more sudden, or surer than that which should be drawn against the heartless swindler who would condemn them to poverty and want, as in this case, or wear a sterner face than against the "careless Gallio," whose indifference has made possible the consummation of such crime.

There is in this record nothing whatever that calls in question the good character, which is shown by two witnesses and not contradicted, and the absolute good faith, of the unfortunate mother; nothing to mitigate the atrocious iniquity of the absconding swindler, and nothing to palliate the careless indifference of the defendant bank, which paid the plaintiff's money to the defaulter, though knowing she claimed it and was even then getting out proceedings to protect her rights.

The judge attached no importance to the defendant's *ex parte* dealings with the jury after verdict. It is no discredit to the plaintiff or her lawyer that she did not enter into competition along that line. The defendant should look to get the money back from the party to whom it was paid out by its own negligence, against the protest of the true owner.

In this case four opinions have been filed, but *Judge Brown,* being a stockholder in defendant bank, does not sit, and, the Court "being evenly divided, the judgment is affirmed." The opinions in favor of affirmation (like those of a contrary view) express the views of each writer only, the conclusion alone that there "being an even division, the judgment is affirmed," is the act of the Court, by operation of law.

In the English courts, until a recent period, each judge gave his opinion in every case, and this was true in the early Reports of this Court, and of the United States Supreme Court to a large extent. The custom of filing only one opinion, which is adopted by all the court (except when there is a dissent) was to save time, and also space in the volume of Reports, but it has always been open to any judge to express his views, whether he agrees with the majority or dissents, or when there is an even division of opinion.

The purpose to be served in filing opinions is to give the reasons actuating the Court, and this applies as much to dissenting opinions and to opinions on a divided court as where there is unanimous opinion. If the reasons given cannot be sustained, upon examination, by the bar and by public opinion, as sound, sooner or later the ruling is reversed by the Court itself, or is cured by legislation.

There is even more cause to give the views of the members where the Court is evenly divided than when one or two members dissent, for it is especially necessary when the Court is evenly divided that the reasons for differing conclusions reached by the members of the Court should be stated, that they may be considered and that the sounder reason, which, under our form of government, it is assumed, will ultimately control, may be adopted in some future opinion, or that legislation may cure the situation.

There is no decision or rule, nor, indeed, is there any power, in any court to control the vote or the expression of the views of any judge, whether by a dissenting or a concurring opinion, or when the Court is evenly divided. Indeed, an examination shows that opinions are more generally filed when the Court is evenly divided, and naturally so, because, as above stated, when the Court is evenly divided, the reasons urged on each side are more important to be given to the public, that on further consideration it may be determined where the right lies.

The first time that this Court laid down the doctrine that when the Court is "evenly divided the judgment below must be affirmed" was in *Durham v. R. R.,* 113 N. C., 240, in an opinion written by the writer of this. The Court did not lay down the rule that in such cases no opinions should be filed, but said, "The judgment below stands, not as a precedent, but as a decision in this case," and in all subsequent cases no different rule has been asserted. On the contrary, in *Ward v. Odell.* 126 N. C.,

946, there were two opinions filed—one on each side. In the same volume, *Boone v. Peebles,* p. 824, there was only one opinion, which was in favor of affirming the judgment, but it was stated in both cases that the Court was evenly divided, and therefore the judgment below was affirmed.

In *Durham v. R. R., supra,* in which the Court laid down this rule, five opinions from the United States Supreme Court and one from Massachusetts were cited as sufficient authority for the proposition, and in each of those, while the judgment below was affirmed, upon an evenly divided Court, opinions were filed.

The cases cited, first, were *Etting v. Bank,* 24 U. S. (11 Wheat.), 59, in which *Marshall, C. J.,* writes an opinion on the merits, which he concludes by saying: "The principles of law which have been stated cannot be settled, but the judgment is affirmed, the Court being divided in opinion upon it."

In the next case, *Benton v. Woosley,* 37 U. S. (12 Pet.), 27, *Taney, C. J.,* writes an opinion on the merits, but concludes by saying that, the Court being equally divided, the judgment below is affirmed. In *Holmes v. Jennison,* 39 U. S. (14 Pet.), 540, the Court writes an opinion affirming the refusal of a writ of *habeas corpus,* but states in the conclusion that it was done by a divided Court affirming the judgment below. Five judges filed opinions in that case, which was one of great importance, and 159 pages are taken up in reporting the case.

The next case cited in *Durham v. R. R., supra,* was an important one also—*Washington v. Bridge Co.,* 44 U. S. (3 Howard), 213, which affirmed the judgment by a divided Court, but there was an opinion for affirmance on the merits filed.

This Court also cited *Durant v. Essex,* 90 Mass. (8 Allen), 103, the opinion holding that a decision by an evenly divided Court affirming the judgment below, while not a precedent, has the "same efficacy in every respect as if the opinion had been rendered with all the judges concurring."

Since *Durham v. R. R.* was decided, in the famous income-tax case, *Pollock v. Loan & Trust Co.,* 157 U. S., 429, the judgment of the Court below was affirmed by an evenly divided Court. The report of that case occupies 226 pages, and two opinions were filed in affirmance and two for reversal. When that case came up on a rehearing (158 U. S., 601) the judge appointed to the vacancy voted for affirmance, but one of the judges who on the former hearing had voted for affirmance voted for a reversal, which was thus carried by a vote of 5 to 4. There were two opinions for affirmance filed, and all four of the dissenting judges writing opinions, among them the present distinguished Chief Justice of that Court. The report of the case occupies 215 pages. Never were dis-

senting opinions more valuable, for the American people have endorsed the views of the dissenting judges and written into the Constitution an amendment, without which it would have been impossible for this country to maintain the present great struggle for the maintenance of civilization and a democratic form of government on the earth. .

Not to multiply instances, in *Downes v. Bidwell,* 182 U. S., 244, known as the "Insular Possessions Case," all nine of the judges expressed their views, the report of the case covering 154 pages. This was the case in which it was said that the Court had "filed nine dissenting opinions."

This Court has never held that it would file no opinion in any case, except on motions for "new trial for newly discovered testimony" (*Herndon v. R. R.,* 121 N. C., 498, and cases there cited, and citations in Anno. Ed.), and then only for the reason that, being not on the law, but purely upon the facts, which can never exactly recur in another case, an opinion would be of no benefit; but of course any judge has a right to file his views, even in such case, should he see fit. Even to *per curiam* decisions, which are decisions without any opinion by the Court, dissent'ng opinions have been filed, this matter being solely in the discretion of the judge. *Harkins v. Cathey,* 119 N. C., 658; *Wyatt v. Mfg. Co.,* 116 N. C., 272, and there are others. In *Thomas v. Fulford,* 117 N. C., 667, there were five opinions, no two of which agreed on all points.

The Court being evenly divided, the judgment of the Court below is affirmed. *Durham v. R. R.,* 113 N. C., 240, and citations thereto in Anno. Ed.

No error.

HOKE, J. I have given this case very careful consideration, and am of opinion that, on the record and verdict, the plaintiff is entitled to recover, and the judgment to that effect should be affirmed.

While fully recognizing the obligation and duty of a bank towards its depositor, the American courts have very generally held that when a bank has reasonable notice of a *bona fide* claim that money deposited with it is the property of another, it should promptly notify its depositor and withhold payment until there is reasonable opportunity afforded the claimant to institute legal proceedings in protection of his rights; and in some instances the bank itself is required before payment to institute proceedings and have the rights of the respective claimants determined. *Commission Co. v. Gerlock,* Mo. App., 326; *Jaselli v. Riggs Bank,* App. D. C. Cases, 159; *Ry. Sav. Inst. v. Drake & Laing,* 25 N. J. Eq., 220; *Wayne Co. Bk. v. Airy,* 95 Mich., 520; 2 Mitchie on Banking, 976; Tiffany on Banking, 50.

By the verdict in the present case, it is established that plaintiff is the owner of the money deposited; that the bank knew that she claimed it,

11—176

and that the bank also knew at the time of payment that plaintiff was then engaged in taking out legal process to assert and protect her rights. She had made inquiry of the bank about this deposit on the day in question, at 10:30 a. m., accompanied by her attorney, one of the bank directors; and the cashier, refusing, not improperly, to inform her of conditions, himself gave decided intimation that her proper course was a resort to legal procedure. Leaving the bank for that purpose, the money was paid out to the husband during the day, between 1 and 2 o'clock, according to her testimony and that of her attorney; and in the meantime a woman, unacquainted in the town, having to arrange a bond and to procure money for attorney's charges and court fees. The entire evidence, to my mind, shows that no fair opportunity was allowed her to protect her interest, and that the payment to her husband was made in violation of her rights; and, to my mind, there is no conflict in the findings of the jury on issues 3 and 5½; the former, framed and designed to ascertain if the bank was aware at the time of payment that she was about to take out legal process; and the latter, whether she had notified the bank it was her money, explained the nature of her claim and requested it be held until she could have it attached. The entire charge of the court, and the different colloquies with the jury on the subject, show that issue 5½ was especially designed to determine whether she had requested the bank to hold the money, and that the jury so understood it.

On the record, I am of opinion, as stated, that the plaintiff's rights in the matter are clearly and directly established by the verdict of the jury on the first three issues, and the result is not affected by the finding on the last issue.

WALKER, J., dissenting from the affirmance of the judgment: It may be well doubted whether the plaintiff has shown that the fund in question did not belong to G. H. Miller, who was her husband. It was given to him to be used in the automobile business, and it would therefore seem that he had the right to deposit it where he pleased and in his own name. The defendant bank offered to show a very good reason for not depositing it in the bank at Belhaven, which was that there was a business rival who was an officer or an employee in that bank, and therefore he placed it in the Bank of Washington. Besides, plaintiff testified that the business was conducted in the name of G. H. Miller with her consent. And thus, again, she further testified: "I knew for at least two weeks that he had the money on deposit, in his own name, in the Bank of Washington, and I did not communicate with that bank, and said nothing about it until the 20th or 21st of July," when she went to the bank with her former attorney to get information about the deposit. She had dealings with the bank after Miller checked out the deposit, and made no complaint to the bank of its action in honoring his check until the latter

part of December following, when this suit was brought. It also appeared by the testimony of her former attorney that she had ample time to have attached the fund after she came to the bank, and before Miller presented his check against the same, about three hours. The same attorney testified that "The papers had been prepared and were waiting for her to come and sign them, and all that was needed to perfect them was her signature, and the advance payment of costs." That "they could have been served within half an hour." The bank extended indulgence to her afterwards on a paper it held against her, and she accepted it without protest or objection at that time or at any subsequent time, until she sued as to the payment of Miller's check on the deposit.

The jury returned the following verdict:

"1. When defendant bank paid check drawn by G. H. Miller, was plaintiff, Minnie Miller, equitable owner of the $800 referred to, as alleged? Answer: Yes.

"2. Did defendant bank, at time it paid check drawn by G. H. Miller for said $800, know that plaintiff, Minnie Miller, claimed to own said fund? Answer: Yes.

"3. Did defendant bank, when it paid said check, know or have reason to believe that plaintiff, Minnie Miller, was proceeding to have same attached? Answer: Yes.

"4. Did payment of said check by said bank cause plaintiff to lose said money? (No answer.)

"5. Is said bank indebted to plaintiff, Minnie Miller, and, if so, in what amount? Answer: Yes; $800, with interest on same from 21 July, 1916 (by the court).

"5½. Did plaintiff, Minnie Miller, before defendant paid out said money, notify said bank that it was her money, and why it was hers, and request said bank to hold it until she could have it attached? Answer: No."

It would appear that the answer to issue No. 2 and that to issue No. 5½ are conflicting, if the defendant was not entitled to a verdict on the issues as they stood. It surely cannot be successfully contended that a bank should hold a fund left with it and refuse to pay a check drawn against the deposit upon a promise to pay checks of the depositor, merely because some one enters the bank and claims the fund without any proof of or suggestion as to the nature of the claim, and that is all the first three issues decide. The knowledge of any claim at all may have consisted in no more than information that she would attach the fund. But here she had all of the necessary time, and failed, according to the testimony of the attorney, to act, when the time required was only one-half of an hour. Did not the bank have the right to infer, when Miller presented his check just before the bank's closing hour for the day—between 1 and 2 o'clock on 21 July, 1915—that if she really intended to attach

the fund when she was in the bank earlier in the day, she had abandoned her purpose, and she took no further action until she brought this action? The conduct of the plaintiff, under the circumstances, should estop her to claim that the bank was in default.

Mr. Morse, in his treatise on Banks and Banking, Vol. 1 (4 Ed.), says, at the close of section 343, p. 626: "Notice from the adverse claimant to the bank should not hold the property any longer than would be necessary for said claimant to push his rights directly against the depositor; that if he did so, he should have an order (attachment, garnishee, or injunction) from the court to the bank to retain the deposit until the question was settled, unless bond of indemnity be given; but that if he did not, within a reasonable time after notifying the bank, proceed against the depositor directly, the bank would be released from any obligation to him, and might act as though it had received no notice of his claim." Upon this authority of a standard text-book (see, also, Zane Banks and Banking par. 134), I need not discuss the difference between the English and American precedents upon this question. They are somewhat at variance. But, whatever the law may be on this question, I am of the opinion that, upon the verdict, the defendant was entitled to judgment; or, at least, to a new trial. The verdict does not find, under the first three issues, that the bank received any notice from the plaintiff of her claim. From all that appears in those issues and the answers thereto, the notice may have come to the bank in some other way; and as to the third issue, it may be said that the plaintiff was in fact not proceeding to attach the fund. If she threatened to do so, she did not execute her threat or begin to do so, but totally neglected to take any action after she left the bank, according to the testimony of her former attorney, who stated that she could have attached within one-half of an hour, as everything was ready for her signature. How could the bank have notice that something was proceeding to be done, when there was no proceeding, but instead an abandonment of all proceeding, or at least a negligent failure to proceed? *Lucus a non lucendo.* This evidence is not controverted. When no attachment was issued, after such a delay, why could not the bank itself proceed to act upon the belief that the claim was not a valid one and had therefore been withdrawn? The last issue finds that the plaintiff did not notify the bank of her title to the fund, and why it belonged to her; nor did she request the bank to hold it until she could have attached it, nor does it appear that she offered to indemnify the bank or save it harmless in any way. It is plain that the bank's position was a very delicate one, and it should not have dishonored Mr. Miller's check unless it had some reasonable ground to believe that the claim of the plaintiff was a valid one. As it is found by the jury, it had only notice of some kind of claim by Mrs. Miller, but none of its nature; and,

she having failed to attach or protect her interest, if she had any, within the usual time, or at least a sufficient time, it would follow that the bank should not have dishonored the·check. Mere notice of a claim is not enough to charge the bank with this heavy liability, when the plaintiff could so easily have informed it of the facts in regard to her title, if she had any, and tendered indemnity to save it from loss, which is a most reasonable requirement, but this she did not do, and the jury have said that the bank "was not even notified that it was her money, and why it was hers, nor did she request the bank to hold the fund until she could attach it." If she had a claim to the money, then the bank was notified that it was hers, and in this respect the findings on the second and on the last issue are in direct conflict. This is also true as to the third and the last issues. All the information the bank had came from Mrs. Miller. The jury found, in answer to the third issue, that the bank "knew or had reason to believe" that Mrs. Miller was proceeding to attach; and yet, in answer to the last issue, they say that she made no request for the bank to hold the fund until it could be attached.

The verdict, if not in favor of the defendant, will be found, upon a careful interpretation by the light we derive from the circumstances of the case, to be conflicting, or at least so uncertain and confusing as to require a new trial in order to prevent what may be, and no doubt is, a great injustice to the defendant. It has paid the full amount once. Shall it be subjected to a double payment upon such a verdict, when the intention of the jury, if we say the least of it, is not clear? The jury would doubtless have answered the fourth issue "No" if the issue had not been withdrawn and the judge had not given the peremptory instruction to answer the fifth issue "Yes" and inserted the amount. I think the fourth issue should have been submitted to the jury or some similar one. They may have found that her loss, if any, was due to her own negligence in leaving the money in the bank after two weeks knowledge of its deposit there, or that she failed to act with ordinary diligence in attaching the fund; and there are other grounds upon which they could have given an answer favorable to the defendant upon such an issue.

I may add that when the jury were informed that the plaintiff claimed a judgment upon their verdict, they addressed the following paper to the court:

"NORTH CAROLINA—Beaufort County.
        In the Superior Court—February Term, 1918.
                        (Title of cause.)
"*To* HONORABLE W. M. BOND, *Judge Presiding:*
    "The undersigned jurors in the above entitled case, since they were discharged by the court, have been informed that the contention is now

made that their verdict is in favor of the plaintiff. If such contention is made, they respectfully represent to the court that it is contrary to the purpose and conclusion of the jury, who intended to find for the defendant, and acted upon the impression and understanding that issue 4, which they did not answer, and 5½, which they answered 'No,' were the vital issues; and if there is any inconsistency in the verdict in this regard, it does not represent the intention of the jury. R. B. Weston, H. G. Selby, J. S. Hodges, J. H. Woolard, Thad E. Adams, J. F. Thomas, Hilton C. Bowen, D. D. Harrison, A. T. Windlwy, L. B. Edwards."

I do not contend that this paper entitled the defendant, in law, to have the verdict set aside, because there is a general rule that a jury may not impeach their own verdict in such a way. But what the jury did is strong evidence in support of my view—that, upon the face of the verdict, their clear intention was to decide in favor of the defendant, because they thought that the answer to the last issue, which was the dominant and controlling one, was decisively in its favor and would entitle the bank to the judgment of the court. Even if the matter is in a state of doubt and uncertainty only, there should be another trial, so that the right of it may clearly appear.

The perilous position of the bank is shown by the two following cases: "It is clearly against public policy to permit a bank that has received money from a depositor, credited him therewith upon the books, and thereby entered into an implied contract to honor his checks, to allege that the money belongs to some one else. This may be done by an attaching creditor or by the true owner of the fund; but the bank is estopped by its own act." *Lockhaven First National Bank v. Mason,* 95 Pa. St., 113. "It requires neither argument nor authority to show that when a bank refuses the check of its depositor, drawn against funds, and pays the money over to a third party, it does so at its peril, and must assume the burden of proof to show not only that the money in question did not belong to the plaintiff (depositor), but also that it did not belong to the parties to whom the bank paid it." *Patterson v. Marine National Bank,* 130 Pa. St., 419.

The English rule is flatly against the plaintiff's right to recover, even upon the phase of this case most favorable to her, and this Court has never adopted or followed any other rule. It is the safer one and favors the free handling of commercial paper, and stabilizes the confidence of depositors in their banks. Any other rule would, in many cases, work injustice, and is not necessary for the protection of the claimant, who can easily save himself by prudent and prompt action in enjoining the bank or attaching the fund, or by enjoining the bank and making the

depositor a party, so that the controversy can be tried out, the respective claims adjusted, and the true owner of the fund ascertained, without subjecting the bank to a double liability.

The evidence is even stronger for defendant than we have so far stated it. The plaintiff admitted not only that her husband had told her, two weeks before the check was paid, that he had deposited the money in the Washington bank to his own credit, but she further said: "I saw the bank book on our desk, where we kept the business papers at the store. Miller had told me that he had deposited it to his personal credit, and the bank book showed it. I had access to the bank book." She told the cashier of the bank that "she had given her husband this money to go into the automobile business." She and her attorney, on the day they were in the bank making inquiry about Miller's deposits, asked the cashier, Mr. Ross, if Miller had any money there, and he replied that he had no right to divulge the confidential affairs of the bank or to tell anything about deposits, save to the depositor or his authorized representative, which was entirely proper, but he added that there was a legal way of getting the information. His conduct immediately afterwards, in discounting her paper and the accommodation he gave, showed clearly that he felt kindly towards her and was not trying to favor her husband as against her. Something has been said about the difficulty of Mrs. Miller's securing a bond for the attachment. The attorney testified that he had agreed to sign the bond and that she was to go to the bank, discount her note, and pay the small amount of advance fees for the attachment. The bank did discount her note, she had the money to pay the fees, and the bond and other papers were ready for her. She had nothing to do then but to sign the papers, as the attorney stated. But she did not go back to his office until too late. The bank was not in default, therefore, but the attachment was not issued because of her own delay. If she had returned to his office, as she promised to do, she would have saved her money, if, upon the facts, it really belonged to her instead of her husband.

I also am of the opinion that the court erred in excluding the proposed testimony as to why G. H. Miller had deposited the money in the Bank of Washington instead of the Bank of Belhaven, the reason given being that there was a business rival in the Belhaven bank who would learn of his business secrets. The fact that he placed the money in the Bank of Washington has been used against the defendant as a suspicious circumstance, and it was entitled to have this evidence admitted to rebut any prejudicial inference that might be drawn from it.

The cases cited in the opinions for affirmance are not in point, because the facts upon which they were decided are not the same as those to be

found in this record. It will not be denied that, under certain circumstances, a bank many be held liable for paying money to the depositor upon his check, but we have no such case here; and, besides, upon the face of the verdict, especially when the latter is construed in connection with the evidence and the charge, the jury clearly intended to decide with the defendant, or there is so much doubt about the matter that it would be just to order another trial.

I have confined my discussion of this case strictly to the law, as is proper for me to do, and have therefore made no reference to extraneous matters, with which I am not concerned. They are not judicial questions, and are entirely foreign to the matter presented for our decision.

ALLEN, J., dissenting from the affirmance of the judgment: The questions presented by the appeal are purely legal, and it obscures rather than aids their correct solution to consider the parties and their needs.

If the plaintiff is a married woman, one of whose husbands committed suicide and the other ran away from her, this may furnish a reason for sympathy, but none for allowing her to recover from the defendant money which it has already paid to her husband, unless the record justifies it; and when the verdict is considered in connection with the charge, which is the proper rule of construction, it seems to me clear that there is an irreconcilable conflict between the findings on issues 3 and 5½, and, if so, there must be a new trial.

The verdict is as follows:

"1. When defendant bank paid check drawn by G. H. Miller, was plaintiff, Minnie Miller, equitable owner of the $800 referred to, as alleged? Answer: Yes.

"2. Did defendant bank, at time it paid check drawn by G. H. Miller for said $800, know that plaintiff, Minnie Miller, claimed to own said fund? Answer: Yes.

"3. Did defendant bank, when it paid check, know or have reason to believe that plaintiff, Minnie Miller, was proceeding to have same attached? Answer: Yes.

"4. Did payment of said check by said bank cause plaintiff to lose said money? (Answer withdrawn by court.)

"5. Is said bank indebted to plaintiff, Minnie Miller, and, if so, in what amount? Answer: Yes; $800, with interest on same from 21 July, 1916 (by the court).

"5½. Did plaintiff, Minnie Miller, before defendant paid out said money, notify said bank that it was her money, and why it was hers, and request said bank to hold it until she could have it attached? Answer: No.

His Honor charged the jury on the third issue as follows:

"Now, gentlemen, it isn't necessary, in order to fix that bank with her intentions, that either Mr. McMullan or Mrs. Miller should have said, in exact words, 'I am going to attach the money.' The meaning of that issue is, Did either of them, by what they said or did, do anything that was reasonably calculated to put Mr. Ross on notice that they were going to start some sort of a proceeding to keep Mr. Miller from getting that money out of the bank? . . . If you find from the greater weight of the evidence, if the bank knew or had reason to believe that Mrs. Miller intended to start legal proceedings which would prevent the bank from paying out that money, and knew that, or had reason to believe it at the time they paid that money, and you find that these facts are shown by the greater weight or preponderance of the evidence, you should answer it 'Yes'; otherwise, 'No.' "

He also charged the jury on issue 5½ as follows:

"The plaintiff contends that, taking all of the other circumstances in logical connection, that, starting out with the fact that she came here for that purpose from the town in which she lives; that she had had a consultation with a lawyer the day before; that he had referred her to a lawyer here; that when she came she went immediately to the lawyer here, to whom she had been referred; that she and her lawyer went to the bank; that after the conversation took place, she left the bank, and that without her seeing Mr. Ross any more, that Mr. Ross phoned Mr. McMullan to the effect that the money had already been drawn out, and she contends that, putting all of these facts together, that you ought to find that Mr. Ross was told enough in that bank by her to let him know that she claimed the money, and that she wanted him to hold it for her a reasonable time, and not pay it out, so that she could assert her rights, if any, to the fund."

The jury could not agree, and came into the court for further instructions, when the following colloquy took place:

Juror: "I wanted to know whether we would have to believe that she directly forbid his paying the money to him, or if from her conversation would lead him to believe.

(Court: "If what she said and did indicated to him or was reasonably sufficient to indicate to him that she wanted that money kept there until she could tie it up, that would be the same thing as telling him in plain language." . . .)

The jury again came into court, when the following proceedings were had:

Court: "Have you agreed on all of the questions?"

Juror: "No, sir."

Court: "Have you agreed on any of them?"

Juror: "No, sir. I think, about the first three could be agreed on, but the main important one is the one we can't agree on."

The jury came into court a third time, when the following proceedings were had:

Court: "I want to ask you, gentlemen, how many of the issues have you agreed on?"

Juror: "We have agreed on the first issue. The last one is the main tangle, though. Mr. Bowen wants you to explain that last issue."

Juror Bowen: "I said I could answer it directly if it wasn't for the charge you stated to us."

These two charges embody the same facts and are substantially alike, and the jury was instructed, under each issue, that it was not necessary for the plaintiff to use any particular words, but that if her language was such as reasonably to lead the bank to believe that she wanted the money held until she could take out legal proceedings, the issues should be answered "Yes"; and still the third issue was answered "Yes," and issue $5\frac{1}{2}$ "No."

In other words, when the record is read as a whole and the verdict is construed with the charge, the jury has found in answer to issue 3 that the conduct of the plaintiff was such as reasonably to lead the defendant to believe that she wanted the money held until she could begin legal proceedings, and, in answer to issue $5\frac{1}{2}$, that her conduct would not lead to this result.

The explanation of this conflict is, that the issues are not identical and the jury was confused by the charge, as is shown by the fact that they asked for further instructions three times on issue $5\frac{1}{2}$, and that ten of the jury signed a paper stating that they thought their verdict was in favor of the defendant.

The evidence of the plaintiff's title to the money is also unsatisfactory, and, upon the whole record, I think justice demands a new trial.

NOTE.—While Justices WALKER and ALLEN hold to the view that no opinions should have been filed in this case because the Court was evenly divided as to what the decision should be, they dissented from the affirmance of the judgment and deemed it proper to express their reasons therefor, as opinions were filed to sustain the opposite view of the case.