Fidelity & Deposit Company of Maryland, Appellant, v. Merchants National Bank, Appellee.

No. 43668.

May 11, 1937.

E. A. Johnson and C. J. Haas, for appellant.

Grimm, Elliott, Shuttleworth & Ingersoll, for appellee.

ANDERSON, J.—The Cedar Rapids Cooperative Dairy Company, which will be hereafter referred to as the Dairy Company, is a corporation, organized in 1926, under the provisions of chapter 389 of the 1924 Code, which provides for the organization of cooperative associations. Its principal place of business was, at the times herein involved, in Cedar Rapids, Iowa, where it maintained an office and where it manufactured butter and bought and sold dairy products, having a large number of customers and doing a very large volume of business. At the time of its organization one Harold G. Smyth was employed as general manager and continued in that capacity until some time in 1932. He was in sole charge of the business and activities of the company. The board of directors and other officers of the company were all actively engaged in farming, residing outside of the corporate limits of Cedar Rapids, and gave but very little attention, if any, to the active business of the company. Smyth handled all of the funds of the association, bought milk and cream, made sales of butter to commission merchants, drew sight drafts, endorsed checks, deposited the moneys of the corporation in various banks, received and answered all correspondence,

hired and discharged all employes, fixed their compensation, and was in fact in complete and unrestricted charge of the entire business of the company. He was empowered to sign checks subject to the counter-signature of some other officer of the company, but this latter provision was never complied with and Smyth had sole charge of and authority over the funds of the company. The principal checking account of the company was carried in the Peoples Savings Bank of Cedar Rapids, and during the years in which Smyth was manager thousands of checks were drawn upon this account by him, most of which passed through the clearing house at Cedar Rapids, and this manner of doing business and the authority exercised by Smyth were generally known by the banking and business interests of the city. Smyth was never specifically authorized or directed to open a checking account in the defendant bank, but savings accounts for investment-purposes were opened by him in the defendant bank and many other banks in Cedar Rapids and elsewhere in Linn County. Funds were withdrawn from such accounts from time to time on Smyth's own signature and all signature cards authorizing withdrawals were signed ''Cedar Rapids Cooperative Dairy Company, by Harold G. Smyth, Manager.''

Prior to March 19, 1931, Smyth had been solicited on various occasions by an employee of the defendant bank to open a checking account with the defendant bank, and on the date mentioned he deposited with the defendant bank a check for $4,985.81 and opened a checking account with the defendant bank in the name of the Cedar Rapids Cooperative Dairy Company, by Harold G. Smyth, Manager, with the signature card properly executed as in other banks where funds of the company had been deposited. Later and on March 8, 1932, another check for $3,923.55 was deposited in the checking account of the dairy company in the defendant bank. The funds so deposited in the checking account in the defendant bank, as well as in the savings account, were withdrawn on checks signed ''Cedar Rapids Dairy Company, by Harold G. Smyth, Manager'' in accordance with the signature cards, with the exception of $3,255.55 which remained in the checking account at the time Smyth was found to be an embezzler, and was later withdrawn by the dairy company. The two checks which we have indicated as having been deposited in the checking account of the defendant bank were received by the dairy company from a commission house in

Chicago in payment for products of the dairy company sold by the commission company. There was withdrawn from the checking account in the defendant bank various amounts during the year 1931 upon checks signed "Cedar Rapids Cooperative Dairy Company, by Harold G. Smyth, Manager" and at least two of such checks were used to pay additional compensation to two of the employes of the dairy company, probably under some secret arrangement with Smyth which was unknown to the officers and directors of the dairy company. The funds represented by the first check deposited in the defendant bank were all exhausted on the last day of December, 1931, and on March 8, 1932, the additional check of $3,923.55 was deposited and withdrawals were made from the deposit up to March 21, 1932, of $668.00, and on the last date there remained in the checking account in the defendant bank the sum of $3,255.55 which was withdrawn later by the president of the dairy company. The checks drawn upon the defendant bank were practically all destroyed by Smyth as they were returned to the dairy company, as well as the monthly statements of the account issued by the bank. However, Smyth, against whom no criminal proceedings were ever instituted, when called as a witness in behalf of the plaintiff, testified that none of the funds withdrawn from the defendant bank were applied for the benefit of the company, and the defalcation or amount of funds embezzled by Smyth appears to have been $4,768.00. Smyth had also withdrawn from the defendant bank the amount of one check for $885.81 and this he deposited in the Cedar Rapids Savings Bank & Trust Company, where he had deposited other moneys of the dairy company, and later withdrew from the said Cedar Rapids Savings Bank $890.00 and deposited it in the Peoples Savings Bank in the checking account of the dairy company. There was left, however, in the Cedar Rapids Savings Bank & Trust Company $885.81, which was later recovered by the dairy company.

The plaintiff, appellant, Fidelity & Deposit Company were sureties upon the bond of the manager, Smyth, and paid to the dairy company the amount of the defalcation, and the dairy company assigned its alleged claim against the defendant bank to the surety company, and the surety company brings this action.

The record shows, and the secretary of the dairy company testifies, that "there is no record any place of any action taken

450

by the board of directors designating any depositories for the company's funds that I can find in these minutes. After this date, December 23, 1926, accounts were opened in a dozen or more banks, in the name of the Cedar Rapids Cooperative Dairy Association by our general manager, Mr. Smyth. He deposited the savings accounts in these banks with the knowledge and consent of the board of directors. I cannot find in the minutes anything to indicate to anyone examining the records that Mr. Smyth's authority to deposit money was limited to any specific bank." Reed, the president of the company, testified that neither he nor the directors knew of the checking account in the Merchants National Bank. However, the witness, Harold G. Smyth, testified, "Mr. Wiley (who was President of the company at the time) knew plenty about this—about the manner in which these funds were handled." In fact, the entire record indicates that no amount of inquiry or investigation in the books and records of the dairy company would have shown that there was any limitation or restriction on the authority of Smyth, its general manager, to open the account in the defendant bank or any other bank, and to withdraw the funds as he did. On the contrary, every record and transaction that could have been investigated and inquired into would have disclosed that Smyth was held out to the public by the dairy company as having full authority in respect to all its business affairs including the deposits, withdrawals, and disbursements of the company's funds. It is conceded by the appellee, bank, that it made no inquiry or investigation as to Smyth's authority to open the account with it, deposit the funds therein, and withdraw them upon checks of the dairy company signed by Smyth as manager. It is also conceded, or shown by the record without controversy, that the bank knew nothing of Smyth's peculations until it was advised by the officers of the dairy company when they discovered the embezzlement.

The appellant contends that the deposit by Smyth in the defendant bank was wrongful, without the knowledge or consent of the dairy company and made with the intent to embezzle the same; that the funds so deposited were the property of the dairy company and remained its property in the defendant bank, and the bank having notice of such ownership is accountable as trustee to the dairy company; that the defendant bank was negligent in not making any inquiry as to the express authority of Smyth,

and that the burden was upon the defendant bank to show express authority in Smyth to deposit and withdraw the funds. While the appellee contends that Smyth as general manager had actual authority to make the deposits in the defendant bank and to withdraw the funds. The appellee further contends that Smyth was held out to the public as having authority to handle the affairs and entire business of the dairy company and that without actual notice of any restrictions or limitations upon his authority the defendant would not be charged with any knowledge of any secret limitations of his authority.

It is not disputed that the funds deposited in the defendant bank were the property of the dairy company and remained the property of the dairy company until withdrawn by Smyth and converted to his own use. It must also be conceded that the defendant bank had no notice or knowledge of any limitations upon Smyth's authority. It is true that the bank made no investigation or inquiry as to Smyth's authority, but that it had knowledge of the fact that he was in sole charge and management of the business and funds of the dairy company and had over a period of years deposited the funds of the dairy company in various banks and had withdrawn the same. In fact the record shows that as far as the contract of employment of Smyth is concerned, and as far as the records of the dairy company show, there was no limitation or restriction upon Smyth's authority to conduct the affairs and business of the company, including the handling of all cash and the deposit and withdrawal thereof in the various banks. We are constrained to hold that Smyth had both actual and ostensible authority to deposit the funds in the various banks, including the defendant bank, and make withdrawals from such deposits.

It is practically the universal holding that a bank is not charged with notice of, nor liability for, a misappropriation of an agent from the mere fact that the agent deposits funds to his own or his principal's account and thereafter misappropriates the funds by checks drawn upon the account. The mere fact that a bank has notice that the funds deposited belong to a principal imposes no duty upon the bank to inquire as to the agent's authority to make the deposit or withdraw the funds. Bank v. Arkenburgh (C. C. A.) 55 Fed. (2d) 130, 132; Quanah Railway Co. v. Wichita Bank (Tex. Sup.), 93 S. W. (2d) 701, 106 A. L. R. 821; Cigar Co. v. Bank, 134 Okl. 286, 273 Pac. 269; Rice v. Bank,

452

140 Wash. 20, 247 Pac. 1009; Rodgers v. Bank, 179 Minn. 197, 229 N. W. 90; Pierce & Gamet v. Bank, 213 Iowa 1388, 239 N. W. 580.

In Santa Marina Co. v. Bank (C. C. A.), 254 Fed. 391, the circuit court of appeals held that where an officer of a corporation had authority to collect the indebtedness due the corporation and to deposit the same in a particular bank, he had authority to collect the items by depositing them in another bank and to withdraw the same without any liability on the bank in which they were deposited in the absence of actual knowledge of bad faith on the part of the officer or agent of the corporation.

In the case of Quanah Acme & Pacific R. R. Co. v. Wichita State Bank, 93 S. W. (2d) 701, 705, 106 A. L. R. 821, decided in April, 1936, the supreme court of Texas carefully and fully considered all of the leading authorities on the questions here at. issue and state the question involved in the case before it as follows:

"If a person negotiates to a bank a bill of exchange payable on its face to the person negotiating it in a trust capacity, and the purchasing bank, in the very transaction by which it acquires the instrument passes its proceeds to the individual checking credit of the trustee on its books, and thereafter allows him to check out such proceeds on his individual checks, and as a result of such transactions the fund is lost to the true owner, is the bank liable for such loss to such true owner?

"This question involves a case where the bank received no part of the funds, and had no actual knowledge that the funds were being checked to persons not entitled to receive them. Also, a case is involved where the bank made no inquiry.

"In our opinion, the above question should be answered in the negative. In this connection, we think the great weight of and better authority is to the effect that it is not deemed a breach of trust, or such a suspicious circumstance as to put a duty on the bank to investigate, for a trustee to carry trust credits in his personal bank account, and this even though such fact is known to the bank. In this connection, it is generally held that the bank is entitled to believe that the trustee will check the trust credit out of his personal account for proper trust purposes. The main reasons for this rule are that to require the bank to investigate such transactions would put a burden on the bank for which

it is not paid by the trust, and would clog the handling of com-
mercial paper in a way that would be to the disadvantage gen-
erally of trust business, and also to business in general.''

In the case of Bank v. Arkenburgh, supra, a bank had hon-
ored checks drawn by a fiduciary against the account without
any knowledge on the part of the bank that the fiduciary was
converting the trust fund to his own use, and it was held that the
bank was not liable, saying, ''Even if the bank had known that
the fund covered by the check constituted a trust in the hands
of Mrs. Dunlop (fiduciary), it would not be liable to the owners
of the fund merely because it allowed and honored checks drawn
against that account, unless it either acquired an advantage or
benefit as a result of the diversion of the trust fund or joined in
the diversion with actual knowledge that such diversion was in-
tended or was being executed, and thereby become privy to it.''

In the instant case there is no contention, or even intima-
tion, that the defendant bank had knowledge of the embezzle-
ment or intended embezzlement by Smyth, or that it in any way
profited by the transaction involved. The bank could only be
held liable for receiving the deposit or permitting the withdraw-
als if it had notice of the dishonest intention of Smyth. A dif-
ferent rule, of course, would prevail if the bank had used the
funds deposited by the agent to pay the agent's debt to the bank,
or in some manner participated in the defalcation. In such·
event the bank would be liable. Such was the situation in Bran-
nen v. Bank, 190 Iowa 630, 180 N. W. 886, cited and relied upon
by the appellant, but that case and others like it, cited by appel-
lant, are not controlling in the instant case for here no appropri-
ation of any of the deposits was made by the defendant bank and
the defendant bank had no knowledge and did not participate in
any way in the misappropriation of the funds by Smyth. There
was nothing in the manner of making the deposits in the defend-
ant bank or in the withdrawal of the same that would serve at
any time during the period of more than a year to put the de-
fendant bank on inquiry as to the honesty or integrity of the
general manager, Smyth. Some of the funds withdrawn were
used to pay bonuses or additional salaries to the employees of
the dairy company, and some were withdrawn and redeposited
in the company's accounts in other banks. During all of the
time that the account was opened in the defendant bank, the

bank handled it as it would other accounts, and each month, or at intervals, mailed to the dairy company statements of the accounts showing deposits and withdrawals. As we have noted, most of the checks representing the withdrawals, as well as these monthly statements of account, were destroyed by Smyth, but of this the bank had no knowledge. It must be concluded that actual knowledge on the part of the defendant bank as to any claimed limitations upon the authority of the general manager of the dairy company, or the fact that the general manager was embezzling a part of the funds, was not proved, and no facts or circumstances are shown such as would put the bank on inquiry as to these matters. Under the circumstances shown in this record the defendant bank had a right to act upon the actual and ostensible authority of the agent, Smyth, and it should not be held liable for his defalcation and embezzlement.

The learned trial court found that Smyth had both actual and implied authority to make the deposits and withdrawals in question, and that the dairy company and its assignee, the plaintiff herein, are and should be estopped, barred and precluded from asserting or claiming the alleged claims against the defendant, and from questioning the acts and authority of the general manager in reference to the matters involved in the transactions with the defendant bank. And the trial court found for the defendant and dismissed plaintiff's petition with costs. We are constrained to hold that the finding and judgment of the trial court has support in the record and in the greater weight of authority.

We do not overlook the fact that there are a few courts of last resort supporting the theory and contentions of the appellant, but such cases are against the overwhelming weight of authority, and we cannot subscribe to rules laid down therein contrary to the rules announced in this opinion. It follows that the judgment of the trial court must be and is affirmed.—Affirmed.

RICHARDS, C. J., and PARSONS, DONEGAN, MITCHELL, STIGER, KINTZINGER, and HAMILTON, JJ., concur.