**GENDLER v. SIBLEY STATE BANK et al.**
Civil Action No. 195.

District Court, N. D. Iowa, W. D.
Oct. 18, 1945.

Thos. H. Quinn, of Faribault, Minn., and S. D. Crary and Free & Free, all of Sioux City, Iowa, for plaintiff.

George E. Gill, of Sibley, Iowa, and Sifford, Wadden & Jepson, of Sioux City, Iowa, for defendant Sibley State Bank.

No appearance for defendant Roy Sanders.

GRAVEN, District Judge.

Case involving question of liability of bank for money allegedly paid it by mistake and liability of bank in regard to deposit after receiving notice that deposit is claimed by a third party. In this case the plaintiff was and is a resident of Lake Crystal, Minnesota. The defendant, Roy Sanders, was and is a resident of Sibley, Osceola County, Iowa. The defendant, Sibley State Bank, was and is an Iowa banking corporation engaged in the banking business in the Town of Sibley, Osceola County, Iowa. The defendant Roy Sanders for some time prior to the year 1943, was a customer of the defendant, Sibley State Bank. He kept a checking account with that Bank and from time to time borrowed money from it. In the year 1943 he was engaged in the purchase of wool from wool producers in the area around Sibley. In the spring of 1943 he had accumulated and was accumulating wool on a considerable scale. Sanders needed funds to pay and settle for such wool, and needed an outlet for the wool. The matter of the marketing of wool was at that time covered by Government war time regulations. Under such regulations Sanders could only sell wool to those authorized by the Government to purchase it. O. J. Ditto of Sibley, Iowa, was at that time vice-president and a member of the board of directors of the Sibley Bank. Mr. Ditto did not work in the Bank and was engaged in another line of business. At the request of Sanders, Mr. Ditto sought to find an authorized purchaser for the wool. Mr. Ditto contacted the plaintiff, Israel Gendler, who was engaged in the purchasing of wool, and who had been authorized by the Government to purchase wool. The plaintiff handled a good part of his wool business by one F. H. Klemer of Faribault, as his attorney-in-fact. There was located at Faribault, Minnesota, a warehouse of the St. Paul Terminal Warehouse Company, an independent warehouseman, which was a properly licensed warehouse for the storage of wool and the issuance of warehouse receipts therefor. Under the regulations then in effect wool so stored could not be sold until after it had been graded and appraised by Government appraisers.

Pursuant to negotiations by Mr. Ditto, the plaintiff agreed to buy a quantity of wool from Sanders through the St. Paul Terminal Warehouse at Faribault. Sanders in May, 1943, then shipped 23,678 pounds of wool to the St. Paul Terminal Warehouse Company at Faribault. On May 29, 1943, the Warehouse Company issued Warehouse Receipt No. F W 41087, certifying that it "had received in storage for the account of Sibley State Bank, Sibley, Iowa, from Roy Sanders" 11,413 pounds of wool. On June 10, 1943, the Warehouse Company issued Warehouse Receipt Number 9962 certifying that it "had received in storage for the account of Sibley State Bank, Sibley, Iowa (Re: Roy Sanders)," 12,265 pounds of wool. While Sanders had previously had loans from the Sibley Bank from time to time, he did not have any loans from that bank from January 1, 1943, up to May 11, 1943. On May 12, 1943, Sanders borrowed $1,500, from the Sibley Bank. On May 17, 1943, he borrowed $941.92 additional. On June 3, 1943, his loan was increased to the sum of $4,811.94. On June 14, 1943, the Bank loaned Sanders the additional sum of $4,000. Upon the making of this loan for $4,000 Sanders owed the Sibley Bank the total sum of $8,811.84. These loans were all evidenced by promissory notes. Sanders borrowed the greater part of the money to settle for the wool he purchased and was purchasing. It was the contemplation and understanding of the Bank and Sanders that the Bank was to have security on the wool for the loans, and that the Bank was to hold the warehouse receipts for the wool as collateral security therefor. Following the receipt by the Bank of the Warehouse receipts dated May 29, 1943, heretofore referred to, the Bank as heretofore referred to on June 3, 1943, increased Sanders' loan to the sum of $4,811.94. The Bank then held that warehouse receipt as collateral security for the loan of $4,811.94. Following the receipt by the Bank of the warehouse receipt dated June 10, 1943, heretofore referred to, the Bank as heretofore referred to, loaned Sanders the additional sum of $4,000, and held that warehouse receipt as collateral security. On June 22, 1943, the Sibley Bank sent the two warehouse receipts to the Security National Bank at Faribault, Minnesota, for collection, writing that bank that it had been informed that the wool had been sold, and requested the Faribault Bank to make remittance to it. On July 6, 1943, the Faribault Bank sent the Sibley Bank a draft in the sum of $7,106 payable to the order of the Sibley Bank. The Faribault Bank in its letter of remittance stated that 17,765 pounds of the 23,768 pounds of wool represented by the

808

warehouse receipts had been sold. The Faribault Bank further stated that the remittance was at the rate of 40 cents a pound for the wool sold, but that 40 cents a pound did not represent the full amount due for the wool sold. The Faribault Bank further stated that it had requested the Warehouse Company to issue a warehouse receipt for the balance of the wool unsold. The Warehouse Company made out warehouse receipt number F.W.N. 10006 dated July 6, 1943, reciting that it had "received in storage for the Sibley State Bank, Sibley, Iowa (Re Roy Sanders)," 5,913 pounds of wool, which receipt was sent to the Sibley Bank. About this time Sanders made another shipment of wool to the Warehouse Company for sale to the plaintiff, and on July 9, 1943, the Warehouse Company issued its warehouse receipt number F.W.N. 10030, reciting that it "received in storage for the account of Sibley State Bank, Sibley, Iowa (re Roy Sanders)" 7,933 pounds of wool. These two warehouse receipts were held by the Sibley Bank as collateral for the Sanders indebtedness to it. Upon receipt by the Sibley Bank of the draft for $7,106 dated July 6, 1943, referred to, the same was deposited in the checking account of Sanders. Sanders on July 7 and 8, 1943, issued checks on his account payable to the Sibley Bank in the sum of $2,000 and $4,843.65 respectively to apply upon his notes to the Bank. The check of $4,843.65 paid up the note of $4,811.89 dated June 3, 1943, in full with interest, and the check of $2,000 reduced the principal of the $4,000 note dated June 14, 1943, to $2,-000. On July 10, 1943, the situation was that Sanders owed the Sibley Bank a note for $2,000, and that Bank held as collateral security therefor two warehouse receipts dated July 6 and July 9, 1943. The matter of the disposal of the wool covered by the last two warehouse receipts and the settlement for the balance due on the first two warehouse receipts dragged along with the Sibley Bank making frequent inquiry as to progress. On September 4, 1943, the Faribault Bank wrote the Sibley Bank that the wool had been graded and appraised and that as soon as it had been bagged and weighed the plaintiff would settle up the account, and suggested that the Sibley Bank send the two warehouse receipts to it for collection of the balance due from the plaintiff. On September 7, 1943, the Sibley Bank sent the Faribault Bank the two warehouse receipts as suggested by the latter bank. On September 28, 1943, the plaintiff by his attorney-in-fact, F. H. Klemer, sent a personal check in the sum of $12,775.88 to the Sibley State Bank. The check was made out jointly to Roy Sanders and Sibley State Bank. Mr. Klemer stated in the letter accompanying the check that it was in settlement of the wool sold by Sanders to the plaintiff. Attached to the letter was a somewhat lengthy statement showing the different grades and amount of wool sold. Mr. Klemer further stated in the letter that it had been "a complicated long drawn out transaction." Mr. Klemer in sending the check for $12,775.88 overlooked and forgot that the draft for $7,106 dated July 6, 1943, had previously been sent in part payment of the Sanders' wool, so that the check for $12,775.88 was $7,106 in excess of what was due Sanders. Upon the check of $12,775.88 being received, it was endorsed by Sanders and the Bank and deposited in the checking account of Sanders on September 30, 1943. On the same day Sanders issued his check to the Bank in the sum of $2,044 in full payment with interest of his note for $2,000. This payment paid Sanders' indebtedness to the Bank in full and was the only payment received by it out of the proceeds of the check for $12,775.88. It appears that Harold Scott, the president of the Sibley Bank, had been unenthusiastic about the Bank making loans to Sanders. When Sanders came into the Bank in connection with the endorsing of the check for $12,775.88, Mr. Odens, the cashier of the Bank, called Mr. Scott from his office in the Bank to the cashier's desk and showed him the check. Sanders then stated that he had made a profit of around $7,000 on the wool transactions. None of the officers of the Bank or those connected with the Bank had any actual knowledge or notice that Sanders had received an over-payment of $7,106. It is believed that it could hardly be expected that the Bank which was only collaterally interested in the transaction would recollect details of a transaction when the agent for the plaintiff who was directly concerned could not keep them in mind. The Sibley Bank acted innocently and in good faith in the transaction, and without any knowledge of any wrongdoing on the part of Sanders. Whether an investigation by the Bank at that time would have disclosed the overpayment is problematical. The first step in such an investigation would doubtless have been to have contacted Mr. Klemer. If Mr. Klemer would have then remembered the previous payment,

which he had forgotten, the matter of the overpayment might then have been discovered, but if Mr. Klemer's recollection was in the same state as it was when he sent the remittance a couple of days before, the overpayment would not have been discovered.

On November 17, 1943, or 48 days after the overpayment was made, it was discovered by Mr. Klemer. On that day he phoned the Sibley Bank and informed it of the mistake and that the plaintiff expected the overpayment to be refunded. The Bank immediately called up Sanders and informed him about the phone call from Mr. Klemer. There was in the checking account of Sanders with the Bank at the time the phone call came in, the sum of $1,155.04, representing the balance left in his account of the proceeds of the check for $12,775.88. The Bank on November 12, 1943, before the phone call came in had accepted or paid checks and other items amounting to $40.90. The Bank informed Sanders that it would not honor any further checks against his account. At the Bank's request Sanders gave the Bank his check for $1,100, for which the Bank wrote a cashier's check in that amount to the order of Sanders. The Bank then retained the cashier's check pending developments. By letter to Sanders dated November 18, 1943, the plaintiff demanded the refund of the sum of $7,106. Sanders insisted that no overpayment had been made and that he was entitled to the money in his account. Sanders then employed a firm of attorneys who made demand on the Bank in his behalf for the $1,100. The Bank consulted Mr. George Gill, attorney for the Bank, who advised it that it could not legally withhold the $1,100 from Sanders. The Bank turned the cashier's check over to Sanders. The matter of the length of time the cashier's check was held by the Bank will be referred to later. On November 23, 1943, Mr. Klemer wrote Mr. Gill, the attorney for the Bank, authorizing him to take immediate steps to protect the plaintiff in regard to the overpayment made to Sanders. The plaintiff did nothing further in the matter until nearly eleven months later when on October 14, 1944, he brought action against the Bank and Sanders for the overpayment of $7,106. The defendant Sanders defaulted in this action and it clearly appears that the plaintiff in fact made an overpayment of $7,106.

The plaintiff seeks recovery against the Bank upon the theory of a constructive trust. The case has two phases, first as to the liability of the Bank before it had notice or knowledge of the overpayment, and secondly as to its liability for the $1,100 in Sanders' checking account after it received notice on November 17, 1943, that the plaintiff claimed ownership of the deposit. Jurisdiction in this case is based upon diversity of citizenship and the case is therefore within the scope of Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487. The alleged wrongful acts of the defendant, Sibley Bank, took place in the State of Iowa. Therefore the law of the State of Iowa is applicable. The elements and nature of a constructive trust have been passed upon by the Iowa Supreme Court on numerous occasions. Rance v. Gaddis, 1938, 226 Iowa 531, 284 N.W. 468; Stout v. Vesely, 1940, 228 Iowa 155, 290 N.W. 116, 117; Eliason v. Stephens, 1933, 216 Iowa 601, 246 N.W. 771, 774. See also, New York Life Ins. Co. v. Clemens, 1941, 230 Iowa 279, 297 N.W. 253. The Iowa rule is in general that a constructive trust can only be established where there is a fraud or unjust enrichment. A constructive trust does not give rise to a fiduciary relationship, but a fiduciary relationship may give rise to a constructive trust. However, a party standing in a fiduciary relationship may be charged as a constructive trustee notwithstanding integrity of purpose and intention. Stout v. Vesely, supra. Where a fiduciary had no actual intent to defraud but is held liable irrespective of intent because of the fiduciary relationship the situation is sometimes referred to as a case of constructive fraud. In Restatement of the Law, Restitution, Sec. 160 page 640, the general rule is stated as follows: "Where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he will be unjustly enriched, if he were to retain it, a constructive trust arises."

On September 30, 1943, when the check of $12,775.88 was received the situation was that the Bank was the holder of two warehouse receipts as collateral security for the re-payment of a loan of $2,000, by Sanders. The plaintiff in paying for the wool made the check out jointly to the Bank as lienholder and to Sanders as owner. Of the amount of $12,775.88, San-

ders was justly entitled to $5,669.88, and the Bank was justly entitled to $2,000 plus interest. When the Bank endorsed the check of $12,775.88 and deposited it in the account of Sanders, the situation was the same as if the Bank had given Sanders cash for the same over the counter. When Sanders gave the Bank a check for the $2,000 note plus interest, the legal situation was the same as if Sanders had given the Bank $2,000 in cash in payment of his note. Langan v. Farmers' State Bank, 1923, 195 Iowa 1108, 192 N.W. 832. The Bank was not unjustly enriched, as it only received what was justly due it, and there was nothing wrongful in Sanders using up to $5,669.88 to pay his debts and for other purposes. The Bank itself has never received any part of the $7,106 overpayment. The $7,106 overpayment was used by Sanders for purposes and objects with which the Bank was not connected. The Bank stood in no fiduciary relation to the plaintiff. The Bank had no actual notice of the overpayment and committed no fraud in connection with the receipt of the check of $12,775.88 on the amount due on the Sanders' note. This is not a case involving the question of a liability of a bank for permitting a fiduciary to misuse trust funds on deposit with it such as is discussed in Grace v. Corn Exch. Bank Trust Co., 287 N.Y. 94, 746, 38 N.E.2d 449, 40 N.E.2d 34, 145 A.L.R. 436, and in Fidelity & Deposit Co. v. Merchants Nat. Bank, 1937, 223 Iowa 446, 273 N.W. 141. In order to charge a bank with liability for receiving money belonging to another person the bank must be in conspiracy with the depositor or actually know of the wrongdoing of the depositor. Mere means of knowledge is not sufficient. Langan v. Farmers' State Bank, 1923, 195 Iowa 1108, 192 N.W. 832. It is the holding of the Court that the defendant, Sibley State Bank, is under no liability to the plaintiff in connection with the receipt of the plaintiff's check for $12,775.88, and the receipt by it from the defendant, Sanders, of the amount owing it by him.

 The other phase of the case is the liability of the Bank for its acts on and after November 17, 1943, after it received notice from the plaintiff that an overpayment had been made and that the plaintiff was claiming the $1,100 in the account of Sanders. This phase brings up the question as to the applicable rules of law where a third party gives notice to a bank that he is claiming a deposit in a bank is the property of such claimant and not the property of the person in whose name the deposit stands. The Iowa Supreme Court in the case of Elliott v. Capital City State Bank, 1905, 128 Iowa 275, 103 N.W. 777, 1 L.R.A., N.S., 1130, 111 Am.St.Rep. 198, overruled its previous rule that a deposit was a loan to a bank. The Court in that case on page 277 of the Iowa citation, on page 778 of 103 N.W., states: "Deposits are made in a bank in accordance with the universal commercial usage, which becomes a part of the law of the transaction. They are neither loans, nor bailments in the strict sense of the term. A deposit is a transaction peculiar to the banking business, and one that the courts should recognize and deal with according to commercial usage and understanding. * * * The transaction is in reality for the benefit and convenience of the depositor, and while the relation of debtor and creditor exists, and the bank has the use of the money for commercial gain, it assumes no further obligation than to pay the amount received when it shall be demanded at its banking house." In 9 C.J.S., Banks and Banking, § 285, p. 593, it is stated: "If a deposit is claimed by a person other than the depositor who forbids the bank to pay it to any person other than himself, the bank may be held liable for a disregard of such notice in case the claim is substantiated."

In the case of Miller v. Bank of Washington, 1918, 176 N.C. 152, 96 S.E. 977, 978 appears the following: "In Tiffany on Banks, p. 50, it is said: 'After receiving notice of an adverse claim, the bank will pay its depositor at its peril.' * * * In Morse on Banks (3d Ed.) § 342, it is said: 'A bank is justified in paying to the depositor or his order until the fund is claimed by some other person; but, if notified that the funds belong to another, it will pay the depositor at its peril.' "

 A bank which is notified by a third party that a deposit standing in the name of one of its depositors is claimed by such third party, under the general or majority rule is in rather a precarious position. If it heeds the notice and refuses to pay the checks of the depositor and then the third party does not substantiate his claim, the bank may have to pay heavy damages to the depositor for the wrongful dishonor of his checks. 9 C.J.S., Banks and Banking, § 365, p. 778. Some courts base a bank's liability for wrongful dis-

honor of a depositor's checks upon the theory of a breach of contract. Thomas v. American Trust Co., 1935, 208 N.C. 653, 182 S.E. 136; Browning v. Bank of Vernal, 1922, 60 Utah 197, 207 P. 462. See also Third National Bank of St. Louis v. Ober, 8 Cir., 1910, 178 F. 678. Other courts regard the action as an injury to the depositor's credit and reputation similar to tort actions for slander and libel. Schaffner v. Ehrman, 1891, 139 Ill. 109, 28 N.E. 917, 15 L.R.A. 134, 32 Am.St.Rep. 192. If the depositor is a merchant or trader and his checks are dishonored by his depository bank, such depositor can according to the majority rule recover substantial damages from such bank without the necessity of actual damages. First National Bank v. N. R. McFall & Co., 1920, 144 Ark. 149, 222 S.W. 40; McFall v. First Nat. Bank, 138 Ark. 370, 211 S.W. 919, 4 A.L.R. 940; Browning v. Bank of Vernal, supra; Third National Bank of St. Louis v. Ober, supra. The Iowa Supreme Court has apparently not passed upon the question. While the term trader as used in this connection originally meant a shopkeeper, now it means any business man. Peabody v. Citizens State Bank, 1906, 98 Minn. 302, 108 N.W. 272. Thus, when a claim is made by a third party to the deposit of a business man, as in the instant case, the bank is in a much more dangerous situation than in cases where the depositor is not a business man. As to the liability of a bank for dishonoring checks see McFall v. First Nat. Bank, 138 Ark. 370, 211 S.W. 919, 4 A.L.R. 947; First Nat. Bank v. Stewart, 204 Ala. 199, 85 So. 529, 13 A.L.R. 305; State Bank v. Marshall, 163 Ark. 566, 260 S.W. 431, 34 A.L.R. 205; 58 A.L.R. 732; Magness v. Equitable Trust Co., 176 Md. 528, 6 A.2d 241, 126 A.L.R. 206.

Because of the difficult situation in which a bank is placed when an adverse claim is made by a third party to a deposit standing in the name of another, The American Bankers Association a number of years ago recommended a statute to protect banks in such cases. The statute so recommended provides in substance that when a third party gives notice to a bank of an adverse claim to a deposit, that the bank does not have to recognize such claim until it is directed to do so by proper court order or unless a proper indemnifying bond is furnished to the bank. Paton's Digest of Legal Opinions (1940) Vol. II p. 1657. According to the same author the following States have adopted the recommended statute or one similar to it: Arkansas, Stat. Digest (Pope's 1937) § 758; California, Gen.Laws Act 652 (Deering, 1937) § 16f; Idaho, 2 Code Ann. (1932) §§ 25-102, 25-1007; Indiana, Stat.Ann.Supp. (Burns, 1933) § 18-2001(c); Kansas, Gen.Stat. Ann. (1935) § 9-174; Louisiana, 1 Gen. Stat.Ann. (Dart, 1932) § 638, Act No. 90 of 1926; Maine, Rev.Stat. (1930) Chap. 57, § 131; Massachusetts, St.1941, Chap. 444 (quoted above); Michigan, 17 Stat.Anno. (1937) § 23.311, Comp.Laws 1929, § 12058; Mississippi Code Anno. (1938 Supp.) §§ 644, 591; Missouri, Mo.R.S.A. §§ 7982 (banks), 8062 (trust cos.); New Jersey, St.Ann. § 17:9-6; New Mexico, Stat.Ann. (1929) § 13-1015; New York, Banking Law (McKinney's) § 134 subd. 5, 6, 7 (banks and trust companies) § 171 subd. 5, 6, 7 (private bankers); § 239 subd. 5, 6, 7 (savings banks); Oklahoma, Stat.Ann. Title 6, § 118v.; Oregon, 4 Comp.Laws Ann. (1940) § 40-1005; Pennsylvania, Stat. Anno. (Purdon's Perm. Ed.) Title 7, §§ 819-905; South Dakota, Code (1939) § 6.-0416; Utah, Rev.Stat.Ann. (1933) § 7-3-52; West Virginia, Code Ann. (1937) § 3210. Iowa has not adopted such a statute.

While it is stated to be the general rule that a bank makes payment to a depositor at its peril after it has received notice of an adverse claim to such deposit, yet there are a minority of courts which do not recognize the rule. In the case of Tassell v. Cooper (England 1850) 9 Common Bench Reports 509, a former agent of one Lord De L'Isle received a check payable to his (the agent's) order upon the assumption that he was still such agent. The former agent deposited the check in the defendant bank in his own name. While the deposit stood thus, Lord De L'Isle notified the defendant bank in writing that he claimed the deposit and would hold the bank harmless in connection with his claim. The defendant bank dishonored the former agent's checks, and he sued it for damages for such dishonoring. It was held that the bank had no right to dishonor his checks. J. Maule, on page 532, states: "It seems to me to be quite clear that the account in question is a banking account of the ordinary kind * * * and that it is not competent for any third party to interpose and say that the banking company in reality contracted with him." On page 534 the same Judge states: "But * * * it seems to me, that the banking company,

having received the money on behalf of the plaintiff, and given him credit for it, became debtors to him for the amount and that the circumstance that the receipt of the cheque by the plaintiff might have been blameable, does not afford any answer to the action." J. Cresswell (commencing on page 534) states: "It is said that the cheque of Vines & Tombs was received by the plaintiff in defiance of an order not to receive it. Assume that it was: if the plaintiff had himself received the cash for that cheque, and had paid the money into his account with the banking company, they clearly would have been responsible to him for it; and I cannot see that it makes the slightest difference, that, instead of doing so, he handed the cheque to the bankers to get cashed, they having no notice at the time that they obtained money for it. * * *."

In the case of Lund v. Seamen's Bank, 1862, 37 Barb., N.Y., 129, one Anders Larrson had deposited $2,200 in the defendant bank. The plaintiff sued the defendant bank for the deposit as an assignee of Anders Larrson. The bank set up as a defense for refusal to pay that Anders Larrson about the time he absconded from Sweden had fraudulently got possession of securities owned by Pehr Larrson and others and that the deposit represented the money received by Pehr Larrson from the sale of the fraudulently acquired securities and that Pehr Larrson and the other owners were claiming the deposit. The court held that this was not a good defense. The court on page 132 of 37 Barb., N.Y., states: "It must be conceded on authority * * * that the claim of the depositor is a chose in action and not a bailment. * * * The rule which forbids a bailee to deny the title of his bailor is not applicable. No principle of law can however be found which permits a debtor for goods sold, or for money lent or deposited, to set up, as a defense against a claim of his creditor, that his title to the goods sold, or money lent or deposited, is defective or wrongful. That question is of no concern to the purchaser or borrower, unless the third party who claims to have been despoiled of his goods or money will proceed, by process of law, to enforce his rights. It can never be permitted that a debtor may volunteer, by plea or answer, the protection of the claims of those with whom he has had no dealings, to defeat liability for the performance of his contracts." In the case of Nehawka Bank v. Ingersoll, 1902, 2 Neb.

Unof. 617, 89 N.W. 618, the precise question was not involved, but the Nebraska court on page 620 of the Northwestern citation states: "So, where a bank receives money from a person, and gives him credit therefor, it is in duty bound to honor his checks to the amount of such deposit, and it cannot refuse to honor his checks or drafts against the fund on the ground that the money deposited belonged to some other person, or that the title of the depositor to it is defective. These are matters in which the bank is not interested or concerned until the third party who claims to own the fund shall proceed to enforce his rights."

It is the claim of the defendant Sibley Bank that the Iowa Supreme Court has adopted the minority rule, while the claim of the plaintiff is to the contrary. The case relied upon by the Sibley Bank is the case of Ford v. Ames Nat. Bank, 1923, 196 Iowa 958, 195 N.W. 742. In that case a wife deposited in her own name with the defendant bank the proceeds of the sale of the family homestead. The husband who was away wired the bank for the money and the bank sent him around $1,700 out of the deposit without the knowledge and consent of the wife. The trial court found that the money deposited was the property of the wife and held the bank liable for the amount of the deposit paid to the husband. On appeal the decision of the trial court was affirmed. The precise holding of the Iowa Supreme Court was that a bank cannot take money out of a depositor's account and pay it to some third party not entitled thereto. This holding is in accord with the general rule that a bank which pays out a depositor's money to a third party claimant without being ordered to do so by court order does so at its peril. Jaselli v. Riggs Nat. Bank, 1910, 36 App.D.C. 159, 31 L.R.A.,N.S., 763, Ann.Cas.1912C, 119. The Iowa Court in the case of Ford v. Ames National Bank, supra, after sustaining the finding and holding of the trial court that the money deposited was the property of the wife and not the husband, goes on to make the statements that are the cause of the differences of opinion as to the Iowa rule. On page 743 of the Northwestern citation the court states: "A bank having received money from a depositor and credited him therewith upon its books, entered into an implied contract to honor his checks, and is estopped from alleging that the money deposited belonged to some one else, or deny the title of the depositor."

That statement lends strength to the claim that the Iowa Supreme Court was adopting the minority rule. However, the Iowa Court then continues with the following statement: "The bank, upon notice of an adverse claim, could doubtless, if satisfied that the claim was made in good faith, retain a sum sufficient to meet the claim; still it must exercise diligence in notifying its customer thereof, and in its intention to protect itself." The majority rule is premised upon the theory that it is proper for a bank to withhold payments from a depositor's account when it receives notice of an adverse claim to such deposit. Therefore, the last quoted statement tends to give support to the view that the Iowa Supreme Court might follow the majority rule. However, because of some other features of the case, it is not necessary to determine whether the Iowa Supreme Court intends to follow the majority or minority rule.

 The liability of a bank to an adverse claimant to a deposit standing in the name of another is clearly not based upon contract for the bank's contractual relations are with its depositor and not with such third party. Therefore, it seems clear that the liability of a bank to such third party must be based on tort. In order to constitute a tort there must be a duty owing from one party to another and a breach of that duty. 62 C.J. p. 1102. Even those courts which follow the majority rule do not hold that it is the duty of a bank to pay a deposit standing in the name of another to a third party claimant without court proceedings. It seems clear that in such cases the bank is not to constitute itself a judge or jury to determine the ownership of the deposit. The cases in which the courts which follow the majority rule discuss the matter of the nature of the duty owed to such third party claimant indicate that the duty that is owed to such third party claimant is the duty to withhold payment until the third party claimant can institute the necessary court proceedings to stop payment to the depositor by court order or process. Huff v. Oklahoma State Bank, 1922, 87 Okl. 7, 207 P. 963; Drumm-Flato Commission Co. v. Gerlach Bank, Kansas City Court of Appeals 1904, 107 Mo.App. 426, 81 S.W. 503. The only duty owed by a bank to a third party claimant under the majority rule then seems to be not to release the deposit unreasonably early after such third party makes known his adverse claim. Under the majority rule it is the duty of the third party claimant to diligently and promptly institute the necessary legal proceedings to stop payment to the depositor by court order or process and if such claimant does not so do the bank is released from liability. In the case of Huff v. Oklahoma State Bank, supra, the failure of the claimant to institute such court proceedings within nine days was held sufficient to justify a jury verdict against him. In the case of Drumm-Flato Commission Co. v. Gerlach Bank, supra, there was a jury verdict against the plaintiff-claimant. On appeal, in passing upon the instructions to the jury, the appellate court on page 504 of the Southwestern citation states: "Defendant was not required, as the instructions declared, to hold the proceeds until a reasonable time had elapsed to enable plaintiff to complete its investigation and to bring suit against defendant. * * * Any one claiming money deposited in a bank to the credit of another ought to be required to exercise the same diligence in taking legal steps to assert his claim thereto that a reasonably prudent and diligent person would exercise in attaching the property of his debtor when satisfied that such debtor is about to make a fraudulent disposition of his property, or to remove the same from the State."

 Where a plaintiff seeks to recover from a defendant for a tort such plaintiff must establish that the breach of duty on the part of the defendant was the proximate cause of the loss complained of. 62 C.J. p. 1104. In the instant case assuming without deciding that the Iowa Supreme Court would follow the majority rule, the burden would be upon the plaintiff as to the $1,100 deposit to establish that the Sibley Bank was under a duty to the plaintiff in regard thereto, and that the Bank breached that duty, and that the breach of that duty was the proximate cause of the loss to the plaintiff of the $1,100. The plaintiff proved notice to the Bank of its adverse claim. Such notice gave rise to the duty on the part of the Bank to withhold payment from Sanders for such length of time that the plaintiff by proceeding diligently and promptly in its institution of a suit could have tied up the deposit by court order or process. The burden is upon the plaintiff to prove that it was diligently and promptly so proceeding with the institution of legal proceed-

ings to tie up the deposit by court order or process when the Bank made an unreasonably early release of the deposit, and that as a proximate cause of such early release that the plaintiff was unable to tie up the deposit by legal proceedings and thereby lost the deposit.

The questions then present themselves as to whether the plaintiff has sustained the burden of proving (1) that the plaintiff after giving of the notice of adverse claim was diligently and promptly instituting legal proceedings to tie up the account by court process or order; (2) that the Sibley Bank made an unreasonably early release of the deposit; (3) that the unreasonably early release by the Bank was the proximate cause of the loss of the deposit to the plaintiff. Both the plaintiff and his agent-in-fact appeared as witnesses, yet neither made any showing that they were promptly and diligently proceeding in the institution of the necessary legal proceedings after they notified the Bank of the plaintiff's adverse claim. The only legal proceedings or legal action shown is the institution of the present suit nearly eleven months after giving notice of adverse claim. In failing to prove that he was diligently and promptly proceeding with the necessary legal proceedings following notice of his adverse claim, the plaintiff has failed to establish one of the essential elements of his case.

It appears that the Bank did withhold payment of the deposit from Sanders for a time. The deposit was not paid to Sanders until after demand upon the Bank by the attorney for Sanders and until Mr. Gill, the attorney for the Bank, advised it that payment could not be withheld from Sanders. Mr. Odens, the cashier of the Bank, testified that the cashier's check representing the deposit was not turned over to Sanders for "quite a while afterwards." Mr. Odens further testified that it was "a few days" after November 17, 1943, before the cashier's check was turned over to Sanders. The Court is unable from the evidence to determine or make a finding as to the length of time the cashier's check was held by the Bank after it received notice of plaintiff's adverse claim, and hence is unable to determine whether or not the Bank did or did not withhold payment of the Sanders deposit for a reasonable time after receiving notice of plaintiff's adverse claim. In failing to show that the Bank did not withhold payment from Sanders for a reasonable time following notice of adverse claim the plaintiff failed to establish another essential element of his case.

The ledger sheets showing the Sanders' checking account indicate that on November 23, 1943, Sanders started depositing to his checking account and that on that date fair sized checks started to be paid from that account. If this indicates that the Bank held up the cashier's check representing the deposit for six days, this Court, as a trier of the facts, would be of the view that since it was a trader's account which was being held up with risk on the Bank for heavy damages for the dishonoring of checks, that the failure of the plaintiff to bring the necessary suit within six days would justify the Bank in releasing the deposit.

There was a trifling few dollars left in the Sanders account after the writing of the cashier's check on November 17, 1943, but they were paid out long before the plaintiff instituted this action.

The last question has to do with the duty of the Bank to have filed interpleader after the plaintiff made adverse claim to the $1,100 deposit. Since the amount involved was not sufficiently large to confer federal court jurisdiction, the Bank could not make use of proceedings for interpleader provided by Rule 22 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. Prior to July 4, 1943, in Iowa there was only a limited form of interpleader provided for by statute for certain special situations. Sections 8264 and 8265 of the 1939 Code of Iowa (common carriers); Sections 9677 and 9678 of the 1939 Code of Iowa (warehouses); Sections 11002 to 11006 of the 1939 Code of Iowa (actions upon contract involving personal property). Prior to July 4, 1943, interpleader in general was governed by the old chancery practice. Hoyt v. Gouge, 1904, 125 Iowa 603, 101 N. W. 464. Under the old chancery practice the use of a bill of interpleader by a bank where a third party claimant was asserting an adverse claim against a deposit standing in the name of another was fraught with doubt and difficulty. See Note, 60 A. L.R. 719. See also Lund v. Seamen's Bank, 1862, 37 Barb., N.Y., 129. On July 4, 1943, the new Iowa Rules of Civil Procedure (Chapter 278, Laws of 50th General Assembly) went into effect. Under Rules 35 to 41 thereof provision was made for an adequate and flexible system of interpleader similar to that provided by the Federal

Rules of Civil Procedure. See Cook, Iowa Rules of Procedure, Annotated, pp. 111–125. The provisions of the Iowa Rules referred to are sufficiently broad to permit a bank to interplead rival claimants to a deposit.

The claim of the plaintiff to the deposit in the instant case was made on November 17, 1943, at which time the new Iowa Rules of Procedure were in effect. The Sibley Bank could have brought an action and interpleaded the plaintiff and Sanders as to the $1100 deposit. However, the fact that the Sibley Bank had the right to interplead the two claimants did not make it the duty of that bank to do so. Under the majority rule the only duty owed by the bank to the plaintiff was, after notice, to hold up the Sanders deposit for such time as would enable the plaintiff by proceeding diligently and promptly to tie up the deposit by legal action. The plaintiff has not established that the Sibley Bank breached that duty.

Thus, whether the Iowa Supreme Court follows the majority or minority rule, the defendant is not liable to the plaintiff in this action.

Judgment will be entered in favor of the defendant Sibley Bank as to the claim of the plaintiff against it. Judgment will be entered in favor of the plaintiff against the defendant Sanders for $7,106, the amount of the overpayment.