**Pierre BOURGEOIS, Plaintiff,**

v.

**CHASE MANHATTAN BANK OF NEW YORK, Defendant and Third-Party Plaintiff,**

**The FIRST NATIONAL CITY BANK OF NEW YORK, Third-Party Defendant.**

United States District Court
S. D. New York.
Feb. 28, 1956.

Jacob Rassner, New York City, for plaintiff, Thomas F. Frawley, New York City, of counsel.

Milbank, Tweed, Hope & Hadley, New York City, for defendant and third-party plaintiff, the Chase Manhattan Bank, William Eldred Jackson and Janet P. Kane, New York City, of counsel.

Shearman & Sterling & Wright, New York City, for third-party defendant, the First Nat. City Bank of New York, Herman E. Compter, New York City, of counsel.

HERLANDS, District Judge.

Plaintiff and defendant Chase Manhattan Bank of New York, have each moved for summary judgment. Both motions are denied for the reasons set forth in this opinion.

The litigation in chief arises out of a banking transaction in 1955, whereby funds were to be transferred from France to the United States. This transaction involved, in one way or another, the following seven participants: the plaintiff, a resident of Miami, Florida; Banque Francaise du Commerce Exterieur (referred to herein as "the French bank"); a client of the French bank, known as Chantiers Navals de La Ciotat (referred to herein as "La Ciotat"); the Mercantile Bank of Miami Beach (referred to herein as "Mercantile"); the First National City Bank of New York (referred to herein as "First National"); the Chase Manhattan Bank of New York (referred to herein as "Chase"), and the Paris Branch of Chase. The transaction will be referred to in greater detail in the course of this opinion.

Plaintiff filed his complaint on August 11, 1955 against Chase. On September 1, 1955, Chase filed a third party complaint against First National.

The complaint demands a total of $648,570 on the basis of two claims: The first charges Chase with having converted a fund of $228,570, allegedly transmitted on June 1, 1955 to Chase by First National for deposit to the credit or for the account of plaintiff. Chase is alleged to have refused to deliver that fund to plaintiff despite plaintiff's right to it and his appropriate demand. The second claim seeks $420,000 as damages resulting from Chase's alleged conversion.

Chase's answer denies any wrongdoing; admits the fact of non-payment to plaintiff, and pleads an affirmative defense predicated upon the provisions of section 134(5) of the New York State Banking Law, McK.Consol.Laws, c. 2. That statute provides:

"Notice to any bank or trust company of an adverse claim to a deposit of cash or securities standing on its books to the credit of, or held for the account of, any person shall not be effectual to cause said bank or trust company to recognize said adverse claimant unless said adverse claimant shall also either procure a restraining order, injunction or other appropriate process against said bank or trust company from a court of competent jurisdiction in the United States in a cause therein instituted by him wherein the person to whose credit the deposit stands, or for whose account it is held, or his executor or administrator is made a party and served with summons, or shall execute to said bank or trust company, in form and with sureties acceptable to it a bond, indemnifying said bank or trust company from any and all liability, loss, damage, costs and expenses, for and on account of the payment of or delivery pursuant to such adverse claim or the dishonor of the check or other order of the person to whose credit the deposit stands on the books of said bank or trust company or for whose account it is held by said bank or trust company."

It is undisputed that plaintiff has taken neither of the steps prescribed by the statute for "adverse" claimants to a bank deposit, i.e., to procure a restraining order or to post an indemnity bond.

In its motion for summary judgment, Chase argues that, upon the undisputed evidence, the plaintiff must be deemed conclusively to be an "adverse" claimant subject to the above-quoted statute and, hence, that plaintiff's failure to comply with that statute compels the granting of summary judgment to Chase.

On the other hand, plaintiff argues that he is not subject to that statute because the evidence conclusively establishes, as a matter of law, that he is not an "adverse" claimant to the $228,579 fund in question; that he has clear and unqualified title to that fund as owner thereof; that there never was or could be any question as to his being the sole claimant to that fund while it was in Chase's possession; and that Chase had actual and constructive knowledge of his ownership at the time it refused to turn over the fund to him. Accordingly, plaintiff's motion is for partial summary judgment on all issues except the amount of alleged damages.

 The circumstances of proof and considerations of policy that permit the granting of a summary judgment are now so well-defined that the controlling principles may be said to be axiomatic. It is necessary only to refer to Circuit Judge Lumbard's recent caveat in Yung Jin Teung v. Dulles, 2 Cir., 229 F.2d 244, 246, where summary judgments were reversed that (a) "If there is any relevant issue of fact which the papers do not resolve," it would be erroneous to grant a motion for summary judgment; and (b) The only papers that may be considered on such a motion are affidavits "made on personal knowledge" and papers that would "constitute evidence which would be admissible at trial."

The competent and essential proof bearing upon the merits of these motions consists of sixteen telegrams, cablegrams, letters, and bank documents; the parties' affidavits to the extent that they are made on personal knowledge; and pre-trial depositions of the defendants. The Clerk's file indicates that plaintiff's pre-trial deposition was taken. However, that deposition is not on file nor has it been submitted to the Court.

 A painstaking analysis of this documentary chronicle leaves much to be desired in the way of a full explanation—by sworn and competent proof—as to the origin, background and true nature of the underlying business and banking transactions reflected only partially in the documentary proof now before me. There are significant lacunae in the submitted evidence with respect to Chase's and First National's initial and subsequent contact with and knowl-

edge of such transactions. This unsatisfactory state of the record may best be shown by referring specifically to the telegrams, cablegrams, and the other papers.

### 1. May 23, 1955: Mercantile's Cable to Paris Branch of Chase

In a cablegram sent on May 23, 1955, Mercantile requested the Paris Branch of Chase to advise the French bank as follows: (a) that letters addressed May 16 to the French bank and La Ciotat constitute fullest reimbursement guarantee that an American bank can issue, as requested in French bank's and La Ciotat's cable, dated April 20, with reference to La Ciotat and Bourgeois, the plaintiff; (b) that "we" are looking for their immediate transfer of funds to Miami, as requested; (c) that "we" are advised that further delay is damaging the chartering situation which was ready long ago; and (d) that "we" expect funds "by Telex."

The record before me does not contain competent proof of the May 16th letters addressed to the French bank and La Ciotat. Nor does the record set forth the April 20th cable of the French bank and La Ciotat. The reference to the plaintiff and La Ciotat in the latter cable is not the subject of clarifying evidence. Similarly, the "immediate transfer of funds to Miami as requested" is obscure, as to who would transfer what funds in what amount, from whom, to whom, and pursuant to what request. The "chartering situation" is fleetingly referred to, without further comment of a probative character.

Moreover, beyond the face of the cablegram itself, there is no clear evidence of the nature and extent of knowledge on the part of Chase's Paris Branch with respect to any of the foregoing matters, particularly the plaintiff's financial interest in them. It is, however, a fact that by May 23, 1955, the Paris Branch of Chase knew of the plaintiff by name.

The reference to a transfer of funds "to Miami" is somewhat ambiguous, as both the plaintiff and Mercantile are residents of Miami.

### 2. May 31, 1955: French Bank Cable to First National

In a cable received on May 31, 1955 by First National, the French bank (a) referred to its prior communication of April 20th for remittance "in suspense account"; (b) instructed First National to transfer immediately $228,570 to Mercantile; (c) stated that the transfer was by order of La Ciotat; and (d) stated that Mercantile will receive "instructions."

The prior communication of April 20th of the French bank to First National is not set forth. (It will be noted that April 20th is also the date of a cable of the French bank and La Ciotat, which refers to the plaintiff and La Ciotat and which is mentioned in Mercantile's cable of May 23, 1955 to the Paris Branch of Chase. It is not clear whether the date of April 20th identifies the same cable.)

The nature and extent of the "suspense account" and "instructions" to be received by Mercantile are not explained.

### 3. May 31, 1955: French Bank Cable to First National

This cablegram was written in French but there is no dispute as to the accuracy of the translation. In it the French bank gave First National the text of a telegram that the latter was directed to transmit in behalf of the former to Mercantile.

This telegram to Mercantile makes the following statements: (a) That the French bank received Mercantile's cable "worded thus." (Neither Mercantile's cable nor its text has been submitted to the Court. The reference to its terms is obscure and indirect.) (b) That the French bank considers Mercantile as having guaranteed "unconditionally the reimbursement at its maturity of a note held by" Mercantile "for $228,570 subscribed by Pierre Bourgeois of New York to the order of Chantiers Navals of La Ciotat." (The actual terms of the guaranty are not set forth. Who is the bene-

ficiary of the reimbursement guaranty is unclear. A copy of the note is not in the record. The consideration for the note is not mentioned.) (c) "under such conditions," the French bank has instructed First National to transfer "to you" [Mercantile] $228,750 "to be entered to the credit of the account with you [Mercantile] of Pierre Bourgeois." (It is to be noted that the French bank's instructions to First National are predicated upon Mercantile's guarantee referred to in "(b)" above. The instruction to First National to transfer $228,570 *to Mercantile* is clear. The next phrase—"to be entered to the credit of the account with you of Pierre Bourgeois"—is an instruction to Mercantile that the $228,570. transferred to Mercantile by First National is to be credited *by Mercantile* to Bourgeois' account *with Mercantile*.)

4. May 31, 1955: First National Night Telegram to Mercantile

Pursuant to the French bank's cabled instructions to First National, First National sent a night telegram to Mercantile quoting, in French, the text of French bank's cable and advising Mercantile that the $228,570 would be transferred to *Mercantile* through Chase on June 1st "without responsibility on our part."

5. June 1, 1955: First National Letter of Instructions and Cashier's Check to Chase

First National delivered to Chase, New York Office, its cashier's check for $228,570 payable to the order of Chase. In an accompanying letter of instructions, it was stated that the check was for the credit *of Mercantile*; that this was being done "under wire advice" and on order of the French bank "as per" First National's night telegram of May 31st "sent direct" to Mercantile.

6. June 1, 1955: Memorandum of Chase's Money Transfer Department

A file memorandum of Chase records the receipt of the $228,570 from First National and the crediting of that amount to Mercantile's account. The memorandum also states that Chase advised Mercantile by telegram that $228,570 had been credited to *Mercantile's* account, on order of the French bank and in accordance with First National's night telegram of May 31st sent directly to Mercantile.

7. June 15, 1955: Plaintiff's Telegram to Chase

On June 15th, plaintiff sent Chase a telegram in which he stated: (a) that the $228,570 deposited by Chase to Mercantile's account "belong to me" [plaintiff] and are "for account of" plaintiff; (b) that on June 9, 1955 plaintiff had sent a telegram to Mercantile in which he demanded that *Mercantile* should immediately credit to his account the $228,570 "based on" First National's telegram of May 31st to Mercantile; and (c) that *Mercantile's* failure to comply with plaintiff's demand would constitute basis for a damage claim against *Mercantile*.

8. June 16, 1955: Chase's Letter to First National

On June 16th, Chase advised First National that it had credited $228,570 "under wire advice" to Mercantile, and that it had received a telegram from plaintiff, which it quoted at length.

9. June 20, 1955: French Bank's Cable to First National

In this cable, the French bank informed First National that Mercantile has "not accepted transfer requested by" the French Bank's May 31st cable. The French bank requested First National to advise it "whether the funds have been returned to" First National and whether they are "at present in account in the name" of the French bank.

The communication between Mercantile and the French bank, in which the former advised the latter that it would not accept the transfer of the $228,570, has not been put in the record.

**10. June 21, 1955: First National's Cable to French Bank**

In response to the French bank's June 20th cable, First National advised the French bank that the funds were not returned to First National and that plaintiff was claiming "funds of Mercantile Bank and its New York correspondent Chase Manhattan."

**11. June 22, 1955: First National's Letter to Mercantile**

On June 22, First National sent Mercantile the texts of the June 20th and 21st cables from and to the French bank. In addition, First National quoted the French bank's latest instructions that Chase should hold the funds "in suspense account" in the name of the French bank for La Ciotat. (It will be noted that the term "suspense account" first appears in the French bank's cable of May 31, 1955 to First National. It is not otherwise described.)

In this letter, First National refers to its payment of $228,570 to Chase "for the credit of" *Mercantile's* account, and adds:

"The amount involved was to be paid under certain conditions to Mr. Pierre Bourgeois."

The "conditions" under which the amount was to be paid to plaintiff, and the name of the bank who was to make the payment are not explicitly mentioned.

**12. June 22, 1955: First National's Letter to Chase**

First National wrote to Chase, transmitting a copy of First National's letter of June 22nd to Mercantile, and forwarding the message from the French bank to Chase in compliance with the French bank's instructions that Chase should hold the funds in a "suspense account" in the name of the French bank for La Ciotat.

**13. June 23, 1955: First National's Letter to Chase**

On June 23rd, First National sent Chase the text of a cable received from the French bank, in which the latter "urgently" requested First National "to return * * * at once funds deposited in suspense account" in the name of the French bank. First National requested Chase to "arrange accordingly." As previously indicated, the funds had not been deposited in a suspense account, but had been deposited by First National in Chase for the credit of Mercantile.

**14. June 23, 1955: Chase's Letter to First National**

Chase advised First National that it was unable to comply with the request that the fund should be deposited in a suspense account because it had given "final credit" for the fund to Mercantile.

**15. June 27, 1955: Mercantile Telegram to Chase**

In a telegram dated June 27th, Mercantile directed Chase to return to First National the $228,570 that had been deposited to Mercantile's account.

**16. June 27, 1955: Chase's Refund to First National**

On June 27th, Chase paid First National $228,570 by check. A file memorandum of Chase refers to this re-transfer, and states that the payment was made "in accordance with instructions from phone today Mercantile National Bank." There is no elaboration of the phone instructions.

**17. Plaintiff's Affidavit**

Plaintiff attempts to explain why the $228,570 was sent to him and why he was at all times the owner of that fund:

"Your deponent has certain contracts with Chantiers Navals de La Ciotat of France for the construction of tankers and your deponent had arranged with Chantiers Navals de La Ciotat to have this $228,570. transferred to the United States for the use, credit and benefit of your deponent and said Chantiers Navals de La Ciotat and your deponent had arranged with Bank Francaise du Commerce Exterieur of Paris, France to have such $228,570. transferred to the United States for the use, credit and benefit of the said plaintiff."

I find plaintiff's affidavit wanting in precise factual detail. What are the "certain contracts" with La Ciotat? What are the arrangements with La Ciotat for the $228,570 transfer? Plaintiff speaks of $228,570 to be transferred to the United States for the credit of plaintiff *and* La Ciotat and, at the same time, he speaks of an arrangement with the French bank to have that sum transferred to the United States for the credit of the plaintiff alone.

There is a definite absence of any persuasive evidence that plaintiff had unconditional title to the funds in question.

The overwhelming weight of the evidence establishes that First National and Chase acted properly in setting up the account in the name of Mercantile, and that they regarded the funds in Chase as to the credit of Mercantile.

The moving affidavits submitted by plaintiff and his attorney conspicuously are silent as to why the French bank ordered the money to be returned and why Mercantile complied with that instruction.

The purpose of section 134(5) is to protect a bank, as stakeholder, against the hazard of double liability. See Leeds v. Guaranty Trust Co., Sup.Ct.N.Y.Co. 1948, 193 Misc. 681, 682, 85 N.Y.S.2d 70; Gendler v. Sibley State Bank, D.C. N.D.Iowa 1945, 62 F.Supp. 805, 810–811. On the record now before the Court, it is clear that the banks had ample basis to act as they did. While there is great doubt of any merit to plaintiff's claims, it cannot be asserted dogmatically that there are absolutely no issues of fact. The Court is dealing here with motions for summary judgment before trial and not with a motion for a directed verdict after trial.

In view of the state of the record, the Court is disinclined to rule as a matter of law that plaintiff is or is not an "adverse" claimant under section 134(5). There are questions of fact that should be resolved only upon a trial after cross-examination and full proof on all issues.

The motions for summary judgment are denied. Settle order on notice.